UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

_____
                                 )
CAPITAL CROSSING SERVICING       )
COMPANY, LLC,                    )
                                 )
        Plaintiff/               )
        Counterclaim Defendant,  )
                                 )    CIVIL ACTION
        v.                       )    No. 3:19-cv-01879-WGY
                                 )
MAPFRE PRAICO INSURANCE COMPANY, )
                                 )
        Defendant/               )
        Counterclaim Plaintiff   )
                                 )
_____)


YOUNG, D.J.[1]                              AUGUST 6, 2024

**FINDINGS OF FACT, RULINGS OF LAW AND ORDER FOR
JUDGMENT AS TO FOUR QUESTIONS ON CASE STATED, AND ORDERS ON
CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

**I. INTRODUCTION**

     The best insurance is never triggered -- the premium is

paid; the policy goes into the proverbial drawer to gather dust.

When catastrophic events occur, gaps in coverage come to light,

and oft times coverage litigation ensues.  In this commercial

property insurance coverage dispute, Capital Crossing Servicing

Company, LLC ("Capital Crossing") claims that MAPFRE PRAICO

Insurance Company ("MAPFRE") initially determined that coverage

_____
     [1] Of the District of Massachusetts, sitting by designation.

applied to many claims, and then declined coverage to hundreds
of Capital Crossing's clients' properties after Hurricane Maria
struck.

The parties stipulated to proceed case stated on four
narrow legal questions based upon certain undisputed facts in
the record as to the Phase I Properties,[2] and submitted cross-
motions for partial summary judgment.  The parties briefed the
case stated and cross-motions for summary judgment.  For the
reasons stated below, the Court rules on the case-stated
questions as follows:

Question No. 1 -- What coverage does the Policy afford, and
in particular, does the Policy cover any of the Phase I
Properties?  The unambiguous Policy language does not cover the
Phase I Properties.  An issue of first impression has arisen,
however, as to those Phase I Properties for which adjustment or
payment was made, and whether MAPFRE is stuck with its coverage
determination as to some of the Phase I properties under the
Insurance Code of Puerto Rico.  The Court rules as an Erie-guess
that as to those certain properties, there may be coverage, but
that there are questions of fact as to fraud or extraordinary

---

[2] In this dispute, 20 properties with the largest losses are
at issue in this first phase of the litigation and are referred
to as the "Phase I Properties."  Joint Statement of Undisputed
Facts ("SUF") ¶ 7, ECF No. 70-1.

circumstances –- statutory exceptions permitting retraction of coverage.

Question No. 2 -- Do Endorsements 1-16 modify the Policy to cover the Phase I Properties?  Other than the premium amount, the Endorsements do not modify the Policy to provide coverage to the Phase I Properties.  The endorsement provides a payment mechanism and does nothing to modify coverage provisions of otherwise non-covered properties.

Question No. 3 -- Does Capital Crossing have an insurable interest in the Phase I Properties?  Yes, Capital Crossing has an insurable interest in the Phase I Properties, but that interest was not insured under the Policy.

Question No. 4 -- Does the existence of other property insurance bar coverage for the Kopel Properties?  No.  Capital Crossing was not the named insured, additional insured, or loss payee as to other purported insurance.

With respect to the cross motions for partial summary judgment, Capital Crossing's motion is denied and MAPFRE's motion is allowed in part and denied in part, as set forth below.

## II.  PROCEDURAL HISTORY

The parties have each filed memoranda, responses, and supporting filings with respect to the case stated questions. See e.g., MAPFRE-PRAICO's Case Stated Brief ("MAPFRE Case Stated

Mem."), ECF No. 92; Pl.'s Mot. Partial J. Case Stated, ECF No. 96; Pl.'s Mem. Supp. Mot. Partial J. Case Stated ("Capital Crossing Case Stated Mem."), ECF No. 98; MAPFRE-PRAICO Resp. to Capital Crossing's Case Stated Br. ("MAPFRE Opp'n Capital Crossing Case Stated"), ECF No. 106; Pl.'s Opp'n MAPFRE's Case Stated Brief ("Capital Crossing's Opp'n MAPFRE Case Stated"), ECF No. 111. The parties each filed cross-motions for summary judgment and oppositions thereto. MAPFRE's Mot. Partial Summary J. ("MAPFRE Mot. Summ. J."), ECF No. 88; MAPFRE's Mem. Supp. Mot. Partial Summ. J. ("MAPFRE Summ. J. Mem.") ECF No. 89; MAPFRE's Statement of Undisputed Facts ("MAFRE SUMF"), ECF No. 90; Capital Crossing's Mot. Partial Summ. J. ("Capital Crossing Mot. Summ. J."), ECF No. 99; Capital Crossing's Mem. Supp. Mot. Partial Summ. J. ("Capital Crossing Summ. J. Mem."), ECF No. 101; MAPFRE Opp'n Capital Crossing's Mot. for Partial Summ. J. ("MAPFRE Summ. J. Opp'n"), ECF No. 109; Capital Crossing's Opp'n MAPFRE Mot. Summ. J. ("Capital Crossing Summ. J. Opp'n"); Capital Crossing Servicing's Resp. MAPFRE's SUMF ("Capital Cross RSUMF"), ECF No. 113. A hearing on the case stated and cross-motions for partial summary judgment was held on November 9,

2023, and the matters were taken under advisement.  See Minute
Order, ECF No. 122.[3]

## III. FINDINGS OF FACT

The parties stipulated to, and the Court adopts and finds,
the unredacted Joint Statement of Undisputed Facts ("SUF"), ECF
No. 70-1, although not every fact is reproduced here.[4]  The facts
are taken almost verbatim from the Joint Statement of Fact, and
quotations are largely omitted for readability.  The diagram
provides a visual representation of the initial relationships of
the parties and their associated entities and agents.

---

[3] Supporting and related submissions are found at ECF Nos.
63, 64, 65, 66, 67, 68, 69, 70, 71, 93, 95, 97, 100, 102, 104,
107, 110, and 114.

[4] The Court denies the Motion to Restrict, ECF No. 71, and
vacates its prior order restricting access to documents inasmuch
as there is no persuasive basis to keep the redacted information
out of the public domain.



### A.    The Parties and Their Respective Businesses

The Defendant Capital Crossing services commercial real estate and loans on behalf of its investor clients, headquartered in Massachusetts.  SUF ¶¶ 1-2.  Capital Crossing has a wholly owned subsidiary based in Puerto Rico, Capital Crossing Puerto Rico ("Capital Crossing PR") that is not a defendant in this action.  SUF ¶ 3.

One of Capital Crossing's clients is Sixth Street Opportunities Partners, L.P., formerly known as TPG Opportunities Partners, L.P. ("Sixth Street").  SUF ¶ 5. Capital Crossing is a party to a Services Agreement, dated March 23, 2011, among Sixth Street, defined therein as the "Company," Capital Crossing, defined therein as the "Primary Servicer," and

California Capital Crossing Inc., defined therein as the "California Servicer" (the "Services Agreement").  SUF ¶ 6. Capital Crossing services certain loans and other assets for Sixth Street and its affiliated entities pursuant to the Services Agreement.  SUF ¶ 8.  Certain entities affiliated with Sixth Street purchased and held loans secured by properties located in Puerto Rico ("the Purchasers").  SUF ¶ 16.  The Phase I Properties are among the properties that secured these loans held by the Purchasers.  SUF ¶ 17.  In September 2014, Sixth Street and its affiliates began purchasing loan assets in Puerto Rico.  SUF ¶ 33.

MAPFRE is an insurance company formed and located exclusively in Puerto Rico, which is licensed to insure interests in Puerto Rico.  SUF ¶ 4.

### B.   Capital Crossing's Insurance Broker

Marsh USA at all relevant times was Capital Crossing's continental United States insurance broker.  SUF ¶ 31.  From October 2014 through March 15, 2017, Marsh Saldaña was Capital Crossing's Puerto Rico insurance broker.  SUF ¶ 32.

### C.   Fall 2014 - The Marsh Brokers Engage MAPFRE for Capital Crossing

On September 29, 2014, Deborah Thomson of Marsh USA emailed Iris Rosa of Marsh Saldaña, stating "I'm pleased happy that we

can offer our client, [Capital Crossing], a Marsh solution to their FP/REO[5] portfolio in Puerto Rico."  SUF ¶ 34.

On October 22, 2014, Alma Rivera of Marsh Saldaña sent an email to José Capre[6] of MAPFRE with the subject line "Capital Crossing Specs," stating:

> Good afternoon Jose, according to a telephone conversation with Iris Michelle from our office, we include the specifications and the State of Securities for the portfolio of loans acquired by the reference corporation.  As Iris informed you, the target rate is 0.30 including property and public liability, in the second worksheet (tab) are the lands that do not have structures, they would be covered for Liability Only.  Let us know if you need additional information.  We will appreciate your prompt response since we have to send the quotes next Wednesday 29.
> Greetings, Alma.

SUF ¶ 36.  Attached to the email was a spreadsheet titled "PR Assets – Closing 9.30.14" which, among other things, included a column which listed either "Ln" or "REO" next to each asset.  SUF ¶ 36.[7]  The October 22, 2014, email also attached a

---

[5] The Court draws the reasonable inference that the "FP/REO" is likely shorthand for "Foreclosed Properties, Real Estate Owned" properties.  The Court makes no finding as to whether MAPFRE understood this term.

[6] José Capre (deceased) was the "Assistant Vice President – Commercial Lines Underwriting" at MAPFRE and was involved in negotiating and underwriting Capital Crossing's insurance program from 2015 to 2017.  SUF ¶ 35.

[7] A reasonable inference is that "Ln" means "loan" and "REO" means "Real Estate Owned."  The Court makes no finding as to whether MAPFRE understood this term.

"Specifications" document which stated Capital Crossing's business was "Real Estate Management."  SUF ¶ 37.

On October 28, 2014, José Capre responded to Alma Rivera's October 22, 2014 email, stating "I am attaching our proposal," attaching a quote titled: "INSURANCE PROGRAM QUOTE" and "Foreclosed Properties – Monthly Reporting."  SUF ¶ 39.

Ted Mehm, Capital Crossing's principal, testified that by "January 2015, [the Purchasers] had not yet finalized the purchase of the loan assets" and that Capital Crossing "knew that once the sale of those assets was finalized, it would need to purchase insurance immediately for the foreclosed properties in the portfolio."  SUF ¶¶ 33, 43.  He also testified that "[a]t the time, however, Capital Crossing did not know which of the loan assets required force placed insurance."  SUF ¶ 44.  He further testified that "Capital Crossing still needed to investigate which of the borrowers had insurance in place."  Id.

On January 19, 2015, Marsh Saldaña sent MAPFRE an email stating, "We are waiting for the revised quote according to the attached values confirmed by our client."  SUF ¶ 45.  The email contained an attached spreadsheet titled "PR Assets – Closed 9/30/14" which, among other things, included a column which listed "REO" next to each asset.  Id.

Earlier on this January 19, 2015, email chain that was forwarded to José Capre of MAPFRE was an email between Deborah

Thomson from Marsh USA and Iris Rosa from Marsh Saldaña, where Ms. Thomson stated: "In addition, Jennifer learned that there are many Force Placed assets to be insured in addition to the REO assets."  SUF ¶ 46.

On January 23, 2015, MAPFRE sent Marsh Saldaña a revised insurance quote for insurance coverage for Capital Crossing. SUF ¶ 47.  This revised quote attached to the January 23, 2015 email was titled: "INSURANCE PROGRAM QUOTE" and "Foreclosed Properties –– Monthly Reporting."  SUF ¶ 48.

### D.    The 2015 MAPFRE Policy

Under a policy dated March 10, 2015, MAPFRE issued to Capital Crossing a Commercial Property and General Liability Policy, Policy No. CBP-008864768-5/00, for the period of February 20, 2015 to February 20, 2016 (the "2015 Policy."). SUF ¶ 49.  The 2015 Policy's Commercial Property Declarations identified the following for the premises:

    FORECLOSED PROPERTY – MONTHLY REPORTING DWELLING
    (BUILDING & STRUCTURE – FIRE RESISTIVE ANYWHERE IN THE
    ISLAND OF PR)

    FORECLOSED PROPERTY – MONTHLY REPORTING COMMERCIAL
    (BUILDING & STRUCTURE – FIRE RESISTIVE ANYWHERE IN
    THEISLAND OF PR)

SUF ¶ 50.

On March 13, Endorsement No. 1 provided as follows:

ENDORSEMENT NO. 001
THE FOLLOWING CHANGES HAVE BEEN MADE TO THE ABOVE POLICY. ALL OTHER TERMS
AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.
EFFECTIVE 02-20-15 THIS POLICY IS AMENDED AS SHOWN

**COMMERCIAL PROPERTY**
For an additional/return premium, the items below are changed as indicated:

IN CONSIDERATION OF A RETURN PREMIUM SHOW BELOW, IT IS HEREBY
UNDERSTOOD AND AGREED THAT THE FOLLOWING CHANGES HAVE BEEN
MADE TO THE ABOVE POLICY:

- THE LIMITS OF INSURANCE FOR PREM. 1 BLDG. 2, FORECLOSED PROPERTY-
COMMERCIAL STRUCTURES, IS DECREASED FROM $2,705,000 TO A NEW LIMIT
OF $1,480,000.

- FORECLOSED PROPERTY ENDORSEMENT IS INCLUDED.

SUF ¶ 54.  Discovery has revealed that the reporting form
was never provided to Capital Crossing or the Marsh
Brokers.  SUF ¶ 56.  Thereafter, prior to the tenth day of
each month, Marsh Saldaña submitted monthly reports to
MAPFRE in the form of excel spreadsheets containing (among
other things) a list of properties and their associated
values.  SUF ¶ 57.  Following receipt of these reports,
MAPFRE issued endorsements adjusting the premium and
coverage amounts based on these reported values, effective
as of the first day of the prior month.  Id.  Those monthly
spreadsheets included a column titled "LN/REO" in which the
term "Loan," "LN," or "REO" would appear next to each
reported property.  Id.

On July 10, 2015, MAPFRE emailed Marsh Saldaña copies
of "the requested endorsements."  SUF ¶ 59.  Attached to
the email were Endorsements 6-8.  Id.  Included in
Endorsement 8, is the following:

```
ENDORSEMENT NO. 008
THE FOLLOWING CHANGES HAVE BEEN MADE TO THE ABOVE POLICY. ALL OTHER TERMS AND CONDITIONS
OF THE POLICY REMAIN UNCHANGED.
EFFECTIVE 06-01-15 THIS POLICY IS AMENDED AS SHOWN

COMMON POLICY PACKAGE
For an additional/return premium, the items below are changed as indicated:

IT IS HEREBY UNDERSTOOD AND AGREED THAT THE NEW REMAINING PREMIUM FOR
PROPERTY IS $56,694. AND FOR LIABILITY $13,894. AS A RESULT OF THE
LIQUIDATION REPORT FOR JUNE 01, 2015 ACCORDING TO THE FOLLOWING:

COMMERCIAL PROPERTY
For an additional/return premium, the items below are changed as indicated:

DEPOSIT PREMIUMS AT MAY 31, 2015
PROPERTY: $78,268.
LESS: $21,574. ($1,270,179. X $0.025 AND $4,380,673. X $0.42)
PROPERTY REMAINING PREMIUM: $56,694.
```

Id.

On October 29, 2015, Marsh Saldaña emailed MAPFRE,
requesting a Certificate of Insurance for "1029 Américo
Miranda Ave Reparto," advising that "insurance is force
placed at $150,000, as of 9/1/2015." SUF ¶ 60. MAPFRE
provided the requested certificate of insurance. SUF ¶ 61.

**E.    The 2016 MAPFRE Renewal**

On January 28, 2016, Alma Rivera of Marsh Saldaña
emailed José Capre of MAPFRE to renew the 2015 Policy for
the following year. SUF ¶ 62. In the email, Ms. Rivera
wrote:

> I am including for you the renewal specifications for
> the reference account effective as of 2/20/2016, this
> year we include the Foreclosed and Repossessed
> endorsement that we use for local banking institutions
> due to the fact that it covers better the portfolio of
> properties acquired by Capital.

Id.

The "Specifications" document, which was attached to
Rivera's January 28, 2016, email, identified CCSC's

business as "Acquisition of Loans, Foreclosed and
Repossessed Properties Portfolios."  SUF ¶ 63.  That
document also included a section titled "Loans, Foreclosed
& Repossessed Properties," which identified "Commercial
Property Insurance" for "Commercial bldgs and single family
dwellings that are Forced Placed . . . ."  SUF ¶ 64.

During her deposition in this action, Iris Rosa of
Marsh Saldaña testified that the Specifications "are our
wish lists, basically," and she agreed that "the actual
terms" of the policy were in the policy, "not the
specifications."  SUF ¶ 65.

The January 28, 2016, email from Marsh Saldaña to
MAPFRE also attached a spreadsheet titled "CCSC – PR
Insured" identifying various assets.  SUF ¶ 66.  Next to
the "Asset ID" column in that spreadsheet, was a column
titled "Ln/REO."  Id.  In that column, the word "Loan" or
"Ln" appeared next to 46 of the 79 assets.  Id.  The term
"REO" appeared next to the remaining assets.  Id.

On February 18, 2016, Ivelisse Maldonado of Marsh
Saldaña emailed Yan Veytsman and Stephanie Nagrath of Marsh
USA, stating, "Attached please find the Worksheet including
our marketing efforts for Capital Crossing Puerto Rico
policy renewal.  We are available . . . . for a Conference
Call to discuss it."  SUF ¶ 67.

On February 19, 2016, Yan Veytsman of Marsh USA emailed Ivelisse Maldonado of Marsh Saldaña, stating, "Insured will likely renew, but may not have a decision today.  Can you kindly ask Mapfre to grant a 30-day extension (i.e. make expiration 3/20/16)?"  SUF ¶ 68. That same day, Ivelisse Maldonado of Marsh Saldaña emailed Yan Veytsman of Marsh USA stating, "Mapfre agreed to the 30-Day Extension."  SUF ¶ 69.

On March 2, 2016, Yan Veytsman of Marsh USA emailed Ivelisse Maldonado and Iris Rosa of Marsh Saldaña, stating "I will circle back shortly with the bind order for the FP/REO."  SUF ¶ 70.

**F.    The 2016 MAPRE Policy**

Marsh Saldaña subsequently timely renewed the 2015 policy on behalf of Capital Crossing ("the 2016 Policy"), Policy No. is CBP-008872707-6.  SUF ¶¶ 71-72.  The 2016 Policy's Commercial Property Declarations identified the following premises:

> FORECLOSED PROPERTY – MONTHLY REPORTING DWELLING
> (BUILDING & STRUCTURE – FIRE RESISTIVE ANYWHERE
> IN THE ISLAND OF PR)
> FORECLOSED PROPERTY – MONTHLY REPORTING
> COMMERCIAL (BUILDING & STRUCTURE – FIRE RESISTIVE
> ANYWHERE IN THE ISLAND OF PR)

SUF ¶ 73.  Thereafter, prior to the tenth day of each month, Marsh Saldaña continued to submit monthly spreadsheets to MAPFRE

containing a list of properties and their associated values, and MAFPRE issued endorsements adjusting the premium and coverage amount based on these reported values, effective as of the first day of the prior month.  SUF ¶ 74.  Some of these monthly spreadsheets included a column titled "LN/REO" in which the term "Loan," "LN," or "REO" would appear next to each reported property, and some of the spreadsheets did not contain this column.  Id.

### G.    Marsh USA Models Capital Crossing's Insurance Program and Detects Potential Deficiencies in Coverage

In February 2016, Marsh USA analyzed Capital Crossing's insurance program through catastrophe modeling to determine Capital Crossing's exposure if a major hurricane or earthquake struck Puerto Rico.  SUF ¶ 79.

On February 25, 2016, Tom Roche from Marsh USA emailed Capital Crossing's principal, Ted Mehm, and stated:

Hi Ted…

It's taken me a while but I wanted to come back to you on a discussion we had at a lunch back in January on Puerto Rico.  You may recall that you express some concerns over what might be the potential exposure to [Capital Crossing] if a major Cat 4 hurricane were to come through Puerto Rico.  We also know earthquake is also an important property cat exposure in PR.  We wanted to look into this question and understand more clearly what your potential aggregate exposure would be with those scenarios in mind.

**I have looked into this issue with my Marsh colleagues from Puerto Rico and NYC who specialize in Lenders Liability/Forced Place coverage.  There are some concerns which should be discussed with you and whoever**

**else you want to involve (e.g. Jennifer H or Sherry).** I
would like to propose a call or meeting (preferably) to
walk you through what we've learned and share a couple
of recommendations on what [Capital Crossing] might do
going forward. Would you have availability for this
discussion anytime next week or week of March 7th? I
think our discussion should last about 45 minutes to an
hour. If you can propose two or three days that work on
your schedule, I will come back with a proposed time.

Thanks and I look forward to discussing this with you.

Tom

SUF ¶ 80 (emphasis added). After some logistical emails, a

meeting was set up, and on Monday, February 29, 2016, Tom Roche

emailed Iris Rosa and Ivelisse Maldonado from Marsh Saldaña and

stated:

Hi Iris…

We are having a meeting with Ted Mehm this Wednesday
[March 2, 2016] at 3:00pm EST to have an open discussion
about how their insurance program would (and would
not) respond should there be a major CAT event —
hurricane or earthquake — in Puerto Rico. We know that
there would be some insurance coverage but we also
believe that it may require more analysis. Would you
(or Ivelisse) be able to join our discussion at 3:00pm
EST (4:00pm Atlantic time)? Please let me know.

Thanks

Tom.

SUF ¶ 83. On Tuesday, March 1, 2016, Yan Veytsman from Marsh USA

emailed Iris Rosa and Ivelisse Maldonado from Marsh Saldaña and

stated:

Hello Iris and Ivelisse,

I would like to pose the following question with respect to policy admissibility in PR: Capital Crossing purchases a mortgage impairment policy (MIP) via the surplus lines market with Lloyd's; it is a worldwide policy. Will this policy be admissible in PR, <u>since it was not placed out of PR?</u> (i.e. PR did not collect any surplus lines taxes). We do not want to have a situation where the client believes they have worldwide coverage only to have claim adjustment/payment issues arise if the policy is inadmissible.

This will surely be a topic of discussion tomorrow:

- The need for a locally placed mortgage impairment policy or contingent property policy.

- If the MIP policy *is admissible* in the PR, we will likely need to purchase additional limits for EQ and Flood. Again, we would rely on your advice if it's best to purchase locally.

Look forward to any thoughts you may have prior to the meeting.

SUF ¶ 84 (emphasis and italics original).

As stated above, Capital Crossing already had a Mortgage Impairment Policy through the Lloyd's of London marketplace that provided worldwide mortgage impairment insurance (the "Lloyd's Policy"). SUF ¶ 85. Section A of the Lloyd's Policy provides:

1. DIRECT PHYSICAL LOSS OR DAMAGE FROM "REQUIRED PERIL"

The Underwriters hereon agree to insure the Assured for loss to the Assured's Mortgage Interest, together with unpaid charges accruing after the date of the direct physical damage up to the date of settlement, including the Assured's Mortgage Interest in a legal fiduciary capacity, Assured's Owner Interest in Foreclosed Property (and Assured's Owner Interest in a legal fiduciary capacity), by reason of direct physical loss or damage occurring during the Policy Period, caused by Fire, Extended Coverage or other direct

physical loss or damage occurring during the Policy Period, caused by Fire, Extended Coverage or other direct physical damage perils which the Assured required the mortgagor to insure against, including the peril of Flood in such amounts as are required to be insured by the mortgagor to comply with the Flood Act, to property against which the Assured has granted or holds a mortgage or to which Assured has taken title under foreclosure or in a legal fiduciary capacity:

(a) for total or partial losses occasioned by reason of the non-existence or inadequacy of such insurance(s); or

(b) in the event of the Assured being unable to collect the loss wholly or partially under the said insurance(s) despite reasonable effort and expenditure, for any reason not caused or contributed to by dishonesty on the part of the Assured, its officers or employees.

2. LIABILITY OF ASSURED IN PROCURING OR MAINTAINING BORROWERS INSURANCE POLICIES

This Section shall indemnify the Assured against loss incurred by the Assured by reason of liability imposed upon the Assured as mortgagee, mortgage fiduciary or mortgage servicing agent arising from Claims first made against the Assured during the term of this Policy for its Negligent Acts, Errors or Omissions in procuring and maintaining, or failing to procure or maintain, valid insurance against the perils of Fire and Extended Coverage or Homeowners Insurance or similar direct physical damage package insurance . . . .

SUF ¶ 86.  The Lloyd's Policy defines "Mortgage Interest" to "mean the interest of the Assured in property sold under a conditional sales agreement, a mortgage, a deed of trust, or any other instrument representing an interest in real property executed for the benefit of assured as security for a loan."

SUF ¶ 87.  The Lloyd's Policy also provides, "[i]n respect of Section A . . . , if the Assured **services mortgages under a**

**written agreement with one or more principals this Policy covers as though the Assured owned the mortgage interest and any payments hereunder shall be made jointly to the Assured and the owners of the mortgage"** and, "[w]ith respect to the Assured's Mortgage Interest in property, the maximum period of coverage under Section A of this Policy shall be limited to 90 days from the date the Assured first becomes aware that the coverage required of the mortgagor was not in force."  SUF ¶¶ 88-89 (emphasis added).

On March 2, 2016, Alma Rivera from Marsh Saldaña emailed José Capre (MAPFRE), stating:

> Good morning Capre, this afternoon we have a conference call to discuss the renewal terms for this client. **As you know, the property reports to be covered under this policy are for Repossessed and Foreclosed properties, but the client has a portfolio of loans that have not yet been repossessed and they are requesting that for the loan portfolio we quote them the "Mortgage Holders Errors and Omissions" coverage** for which I have included the ISO form for your reference; it covers the following in regard to the loan portfolio:
>
>> Property insurance for mortgage companies that provides coverage for the lender's interest in mortgaged property in the event of uninsured or underinsured damage to the property—typically, because the borrower has failed to maintain the required property insurance and name the lender as mortgagee. Mortgage impairment insurance is written primarily for mortgage servicers but is also purchased by mortgage originators that need to comply with federal (Federal National Mortgage Association (FNMA) or government National Mortgage Association (DNMA)) or other lender requirements. Also sometimes referred to as mortgage errors and omissions

    (E&O) insurance or mortgageholders E&O insurance.

We need you to quote us two alternatives for $5,000,000 and $10,000,000 including Special, Wind, EQ and Flood, even if they lower the ceiling on Flood.

Please call me if you have any doubts or questions, we look forward to hearing from you as soon as possible.

SUF ¶ 90 (emphasis added).

On that same day, Wednesday, March 2, 2016, Yan Veytsman of Marsh USA emailed Ivelisse Maldonado and Iris Rosa of Marsh Saldaña stating:

Hello Iris,

Per our discussion this afternoon, kindly follow up with MAPFRE for the following two items:

**Mortgage Impairment coverage with various limit options.**

Condition that policy will pay higher of FMV or RC valuation

I will circle back shortly with the bind order for the FP/REO.

Thanks,
Yan

SUF ¶ 91 (emphasis added).

On Monday, March 7, 2016, Alma Rivera from Marsh Saldaña emailed José Capre and Carmen Díaz from MAPFRE, stating:

Hi Capre, we are following up on this, **the client is very interested in this coverage, please we need to confirm something today if possible,** alternatives of $5,000,000 and $10,000,000, thanks,

Alma

SUF ¶ 92 (emphasis added).

On Tuesday, March 8, 2016, Carmen Diaz from MAPFRE emailed Alma Rivera, stating:

Good day Alma:

The maximum limit we can offer for Mortgage Errors & Omissions is $1MM with a premium of $750.  Keep us updated on this renewal. Regards

SUF ¶ 93.

Carmen Diaz sent Alma Rivera another email seventeen minutes later attaching Commercial Property ISO Form CP 0070 and stating:

Alma:

I omitted mentioning to you that coverage is as coverage type CP 0070 (ed 10/12) reads.  Regards

SUF ¶ 94.

The ISO form for "Mortgageholders Errors and Omissions Coverage" that was attached to Ms. Diaz's follow-up email identified coverage for:

loss to your 'mortgageholder's interest' in Covered Property due to error or accidental omission, by you or your representative, in the operation of your customary procedure in requiring, procuring and maintaining 'valid insurance' payable to you as mortgageholder against the Covered Causes of Loss.

SUF ¶ 95.

The ISO form for "Mortgageholders Errors and Omissions Coverage" that was attached to Ms. Diaz's follow-up email also provided:

Coverage Extension – Mortgages Serviced For Others

We will cover loss arising from mortgages owned by others and serviced by you as if you owned the "mortgageholder's" interest in them. All such mortgages must be serviced under a written contract. We will make loss payable jointly to you and the mortgage owner.

SUF ¶ 96.

The ISO Form for Mortgageholder's Errors and Omissions coverage contained an exclusion for "Any event that occurs more than 30 days after you know that an error or accidental omission may have occurred." SUF ¶ 97. Yan Veytsman of Marsh USA testified that the "Marsh team" eventually determined that the Lloyd's Policy could apply in Puerto Rico, so Capital Crossing maintained that coverage. SUF ¶ 98 (emphasis added). Accordingly, Capital Crossing did not purchase any additional insurance from MAPFRE relating to Alma Rivera's March 2016 inquiry detailed above. SUF ¶ 99.

**H.  Late 2016 – Capital Crossing's Client, Sixth Street, Requests that Capital Crossing Force Place Insurance on Assets that It Services Above $250,000**

On September 27, 2016, Sixth Street employee Arthur Romeo ("Romeo") sent an email with the subject line "PR Insurance" to Jeff Anderson ("Anderson") and David Fitzpatrick of Capital Crossing saying, "Please go ahead and force place insurance for assets with [Capital Crossing] values >$250K with a budget for

the insurance less than $130K." SUF ¶ 27.  On March 1, 2017,
Jeff Anderson emailed Arthur Romeo stating:

> Arthur,
>
> We continue to review the portfolio and request updated
> evidence of insurance when we speak with borrowers.  As
> discussed several months ago we for[c]e placed insurance
> on all collateral with a CapX value greater than $250,000
> where the borrower has not submitted evidence of
> insurance.  The team has reviewed the portfolio and we
> believe it makes sense to force place insurance on loans
> with a CapX value greater than $150,000.  Outlined below
> are the number of loans and associated costs to place
> this insurance:
>
> • 21 piece[s] of collateral with a CapX value between
> $200,000 and $250,000 that do not have evidence of
> insurance.  The cost to force place insurance on these
> properties is $41,300.
>
> • 35 piece[s] of collateral with a CapX value between
> $150,000 and $200,000 that do not have evidence of
> insurance.  The cost to force place insurance on these
> properties is $54,025.
> If we are able to obtain update evidence of insurance
> from the borrower the allocated cost to force place
> insurance will be reimbursed to the investor.
>
> Please let me know when you have a few minutes to
> discuss.
>
> Jeff.

SUF ¶ 28.

On March 23, 2017, Anderson sent an email in the same chain
as the above email stating:

> Arthur,
>
> I wanted to follow up with you on the below email.
> We are recommending Force Placing insurance on the below
> properties.

Let me know if you are in agreement and I will bind
coverage today.

Jeff

SUF ¶ 29.  Later that day, Romeo responded to Jeff Anderson's

March 23, 2017 email, "OK."  SUF ¶ 30.

**I.   Renewal of 2017 Policy – the Policy at Issue**

On January 19, 2017, Ivelisse Maldonado of Marsh Saldaña

emailed Odette Quiles Rodríguez and José Capre (MAPFRE) saying:

Attached are our Specifications for the Policy Renewal
Quote for "**Loans,** Foreclosed & Repossessed Properties"
of Capital Crossing Servicing Company LLC. . . . I
include the attached Excel Table with the monthly
reports until December 2016 to have it as a reference
of the behavior of the account . . . We are waiting
for your comments and quote.

SUF ¶ 100 (emphasis added).  The 2017 Specifications stated that

Capital Crossing was in the business of "Acqui[ring] Loans,

Foreclosed and Repossessed Properties Portfolios."  SUF ¶ 101.

The 2017 Specifications also contained a section titled "Loans,

Foreclosed & Repossessed Properties."  The specifications

stated:

A. The insurance provided by this endorsement is
extended to apply to loss or damage to buildings and
structures as follows:

1. Described in the schedule of **loans,** foreclosed and
   repossessed buildings or properties already
   acquired at time of inception.

2. Acquired by you during the policy period through
   repossession, foreclosure, deed in lieu of
   foreclosure or as mortgagee in possession . . .

> 3. Commercial bldgs and single family dwellings that
>    **are Forced Placed . . . .**

SUF ¶ 102 (emphasis added).  As highlighted above, the
specifications sought to include "loans" and "forced placed."

## J.    March 2017 - Capital Crossing Switches Insurance Brokers

On March 15, 2017, Demetrios Kyrios, a Managing Partner of
Capital Crossing, executed the broker of record letter that
allowed insurance broker Noemí Pérez Insurance Partners ("NP
Brokerage") to act as Capital Crossing's "exclusive insurance
broker regarding" the following policies:

1. Commercial Package Policy #CBP 8872707-6 and
2. Commercial Umbrella Policy #CLX-0045789.

SUF ¶ 104.  Effectively, Capital Crossing switched horses mid-
stream.

On March 27, 2017, Alma Ortiz of MAPFRE emailed Gloria
Ricard of J. Jaramillo Insurance, Inc. ("Jaramillo"), MAPFRE's
insurance agent, the following:

> Instructions for renewing the referred-to policy are as
> follows:
>
> Property
> *Foreclosed Property Dwelling Limit $7,797,624
> *Foreclosed Property Commercial Limit $78,044,940
> These limits are based on the report from February
> submitted by the Insured.
>
> Property Premium Deposit $25,000
>
> The rates remain unaltered, as are the current account
> terms.  Please note that the only properties we grant
> coverage to are those constructed with concrete.  Any

other property not meeting this requirement will not be
insured.  Below are the rates granted:

Dwelling: $0.025
Commercial: $0.042

Include attached endorsement Foreclosed Coverage
(Reporting Form)

Liability Premium Deposit $4,270
Liability: $10.00 (per building or structure)

Please note the Quote for Renewal sent in which the
policy only provides for force placed exposure
. . .

SUF ¶ 105 (emphasis in original).  Attached to the email was

Endorsement A, Foreclosed Coverage (Reporting Form).  Id.

On March 28, 2017, Gloria Ricard from Jaramillo sent

Desiree Vázquez ("Vázquez") from NP Brokerage an email,

providing:

I am advancing Mapfre's quote for renewal of the
Package based on the last report provided for the
month of February 20, 2017.

PACKAGE:
Property
*Foreclosed Property Dwelling Limit USD 7,797,624
*Foreclosed Property Commercial Limit USD 78,044,940

These limits are based on the February Report submitted
by the Insured whereby a liquidation endorsement was
made (see attached):

Property Deposit Premium USD 25,000
Rates remain unchanged from the current terms of the
account. . . .  Below are the rates granted:

Dwelling: USD 0.025
Commercial: USD 0.042

[26]

> Include attached endorsement Foreclosed Coverage
> (Reporting Form).

SUF ¶ 106 (emphasis omitted).  Attached to the March 28, 2017

email from Gloria Ricard of Jaramillo was a "Commercial Property

Quotation," which contained the following:

THE NAMED INSURED IS: Limited Liability    BUSINESS DESCRIPTION:  REAL ESTATE MANAGEMENT
Company (LLC)

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL TERMS OF THIS POLICY, WE AGREE
WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

| THIS POLICY CONSISTS OF THE COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. | | |
|---|---|---|
| | | PREMIUM |
| COMMERCIAL PROPERTY | $ | 25,000 |
| COMMERCIAL GENERAL LIABILITY | $ | 4,270 |
| COMMERCIAL CRIME AND FIDELITY | $ | |
| COMMERCIAL INLAND MARINE | $ | |
| ESTIMATED PREMIUM | $ | 29,270 |
| POLICY PREMIUM | $ | 29,270 |

. . .

LOCATION: 1  BUILDING: 1
PROPERTY AT YOUR PREMISES
ADDRESS: FORECLOSED PROPERTY-DWELLING MONTHLY REPORTING, ANYWHERE IN THE ISLAND OF PR,
SAN JUAN, PR 00936
BUILDING DESCRIPTION: FIRE RESISTIVE DWELLING - (BUILDING OR STRUCTURE) MONTHLY REPORTING
PROTECTION CLASS: 8 CONSTRUCTION: FIRE RESISTIVE CONSTRUCTION YEAR: 1990

. . .

LOCATION: 2  BUILDING: 1
PROPERTY AT YOUR PREMISES
ADDRESS: FORECLOSED PROPERTY-COMMERCIAL MONTHLY REPORTING, ANYWHERE IN THE ISLAND OF PR,
SAN JUAN, PR 00936
BUILDING DESCRIPTION: FIRE RESISTIVE COMMERCIAL- (BUILDING OR STRUCTURE) MONTHLY
REPORTING
PROTECTION CLASS: 8 CONSTRUCTION: FIRE RESISTIVE CONSTRUCTION YEAR: 1990

SUF ¶ 107.  Also attached to the March 28, 2017 email from

Gloria Ricard of Jaramillo was the Form titled "Endorsement 'A'

FORECLOSED COVERAGE (Reporting Form)."  SUF ¶ 108.

Capital Crossing's February 2017 report listed assets in an excel spreadsheet titled "Updated Report Including Changes Reported as of 1/1/2017."  SUF ¶ 109.  In that spreadsheet, under the heading "Changes Reported by the Insured as of 1/1/2017" was a chart that included a column titled "Ln/REO." Id.  In that column, the term "Ln" appeared next to seven of the 10 assets.  Id.  Capital Crossing's broker provided MAPFRE or its insurance agent a monthly spreadsheet identifying various assets.  The report was provided on an excel spreadsheet.  SUF ¶ 110.

### K.    The 2017 Policy -- the Policy at Issue

MAPFRE issued to Capital Crossing Policy number 54-CP-200005675-0 with an effective period running from February 20, 2017 to February 20, 2018 ("the Policy")[8].  SUF ¶ 111.  The Commercial Property Declarations of the Policy provides:

**THE NAMED INSURED IS:** Limited Liability Company (LLC)    **BUSINESS DESCRIPTION:**  REAL ESTATE MANAGEMENT

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

| THIS POLICY CONSISTS OF THE COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. | | PREMIUM |
|---|---|---|
| COMMERCIAL PROPERTY | $ | 25,000 |
| COMMERCIAL GENERAL LIABILITY | $ | 4,270 |
| COMMERCIAL CRIME AND FIDELITY | $ | |
| COMMERCIAL INLAND MARINE | $ | |
| TOTAL PREMIUM | $ | 29,270 |
| POLICY PREMIUM | $ | 29,270 |

*CERTIFIED TRUE COPY OF ORIGINAL DOCUMENTS*

---

[8] The 54-CP-200005675-0 policy is demarcated "the Policy" because it is the policy at issue in this action.

```
LOCATION: 1  BUILDING: 1
PROPERTY AT YOUR PREMISES
ADDRESS: FORECLOSED PROPERTY-DWELLING MONTHLY REPORTING, ANYWHERE IN THE ISLAND OF PR,
SAN JUAN, PR 00936
BUILDING DESCRIPTION: FIRE RESISTIVE DWELLING - (BUILDING OR STRUCTURE) MONTHLY REPORTING
PROTECTION CLASS: 8 CONSTRUCTION: FIRE RESISTIVE CONSTRUCTION YEAR: 1990
```

```
LOCATION: 2  BUILDING: 1
PROPERTY AT YOUR PREMISES
ADDRESS: FORECLOSED PROPERTY-COMMERCIAL MONTHLY REPORTING, ANYWHERE IN THE ISLAND OF PR,
SAN JUAN, PR 00936
BUILDING DESCRIPTION: FIRE RESISTIVE COMMERCIAL- (BUILDING OR STRUCTURE) MONTHLY
REPORTING
PROTECTION CLASS: 8 CONSTRUCTION: FIRE RESISTIVE CONSTRUCTION YEAR: 1990
```

SUF ¶ 115.

Condition A of the Policy provides, among other things:

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time.  It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning: 1. This Coverage Part; 2. The Covered Property; 3. Your interest in the Covered Property; or 4. A claim under this Coverage Part.

SUF ¶ 117.  Condition B of the Policy's Commercial Property Conditions states, "[t]he breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist."  SUF ¶ 118.

The Policy's "Puerto Rico - Windstorm Percentage Deductible Clauses" Endorsement provides:

**As used in this endorsement,** the terms 'specific insurance' and 'blanket insurance' have the following meaning: Specific insurance covers each item of insurance (for example, each building or personal property in a building) under a separate Limit of Insurance.  Blanket Insurance covers two or more items of insurance (for example, a building and

personal property in that building, or two buildings)
under a single Limit of Insurance.

SUF ¶ 119 (emphasis added).

Section A of the Building and Personal Property Coverage

Form of the Policy provides:

A. Coverage

We will pay for direct physical loss of or damage
to Covered Property at the premises described in
the Declarations caused by or resulting from any
Covered Cause of Loss.

SUF ¶ 120.

The Form titled "Endorsement 'A' FORECLOSED COVERAGE

(REPORTING FORM)" of the Policy states:

This endorsement modifies insurance provided under
the Building and Personal Property Coverage Form of
this policy.

**FORECLOSED PROPERTY COVERAGE**

1. **Coverage**
   (a) **The insurance provided by this endorsement
   is extended to apply to loss or damage to
   buildings and structures:**
   **I. Described in the Schedule (Report) of Foreclosed
      Property; or**
   **II. Acquired by you during the policy period
   through repossession, foreclosure, deed in lieu
   of foreclosure or as mortgagee in possession,
   and**

           **a. Not yet described in the Schedule
   (Report) of Foreclosed Property; or**
           **b. Not reported to us**

   (b) Covered Causes of Loss – See applicable
   Causes of Loss Form as shown in the
   Declarations.

   (c) Insurance under this endorsement will end on
   the earliest of the following dates:

1)  The date other specific insurance applies to the property; or

2)  The date this policy expires

2.  Limit of Insurance
(a)  The most we will pay for loss or damage in any one occurrence under this endorsement is the limit of insurance shown in the Schedule (Report) of Foreclosed Property for each building or structure.

(b)  The most we will pay for loss or damage to any one building or structure not reported to us is the smaller of the following amounts:
   I. The value of the building or structure which you reported to us; or
   II.$1,000,000.

3.  Reporting Provisions
a.  Within ten (10) days after the end of each month, you must file with us a completed Schedule (Report) of Foreclosed Property including at least the followings information for each risk:
1)  Loan number
2)  Premises address
3)  Property Type
4)  Replacement Cost Value

You may not correct inaccurate reports after loss or damage.

b. The Coinsurance Additional Condition is replaced by the following:
If in your last Schedule (Report) of Foreclosed Property, before a loss or damage, the building or structure that suffers the loss shows a limit of insurance that is less than the Replacement Cost for that particular building or structure, we will not pay a greater portion than:
1)  the values you reported for the building or structure where loss or damage occurred, divided by
2)  The Replacement Cost at the time of loss for that building or structure.

4.  Premium Adjustment
For property to which this endorsement applies, the premium charged at the inception of each policy year is an advance premium.  We will determine the premium

liquidation on a Monthly basis, based on the Schedule (Report) of Foreclosed Property submitted to us every month.

5.    Failure to Submit Reports
If at the time of loss or damage you have failed to submit:
    a.    The first required Schedule (Report) of Foreclosed Property; we will not pay more than 75% of the amount we would otherwise have paid.

    b.    Any required report of values after the first required report; **we will only pay for loss or damage at premises reported in your last report filed with us before the loss.**

SUF ¶ 121 (emphasis added).  Notably, the policy did not include

the term "loans" as set forth in the specifications.

    Under the Policy, Capital Crossing had a duty to

"[c]ooperate with [MAPFRE] in the investigation or settlement

of the claim."  SUF ¶ 122.  The Policy also provides that

MAPFRE "may examine any insured under oath . . . about any

matter relating to this insurance or the claim[.]"  SUF ¶ 123.

    Endorsements 1 to 16 of the Policy state that "[a]n

additional premium . . . is due as a result of the liquidation

report" for that month "according to the following . . . ."  SUF

¶ 127.  The Endorsements then identify the total values for

commercial and residential properties stated in Capital

Crossing's monthly report and, applying the rates specified in

the Policy, specify the new premium amounts.  Id.  Endorsements

1 to 16 of the Policy say, "THIS ENDORSEMENT CHANGES THE POLICY.

PLEASE READ IT CAREFULLY."  SUF ¶ 129.

During the term of the Policy, Marsh Saldaña submitted monthly spreadsheets to MAPFRE containing a list of properties and their associated values, and MAFPRE issued sixteen (16) corresponding endorsements adjusting the premium and coverage amounts based on these reported values, effective as of the first day of the prior month.  SUF ¶ 124.  Some of these monthly spreadsheets included a column titled "LN/REO" in which the term "Loan," "LN," or "REO" would appear next to each reported property; some of the spreadsheets did not contain this column. Id.

Rafael Rivera, MAPFRE's Vice President for Claims, was designated as MAPFRE's corporate designee pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure on topics including, "the drafting, underwriting, and/or issuance of the Policy," and MAPFRE's "decision to deny coverage for any of the properties involved in this matter, and the basis for such denial."  SUF ¶ 130.  During his deposition, Rivera was asked the following question: "[i]f a report is provided on October 9 of the year, would the coverage for those properties included on the report be effective October 1 or September 1."  Rivera responded: "[t]he coverage would be retroactive for the prior month – previous month – sorry" and agreed that this "assum[es] everything else in the report is accurate and there's no other problems with coverage or other defenses."  SUF ¶ 131.

Jennifer Howard was Assistant Vice President and later Vice President of Capital Crossing. SUF ¶ 132. Describing her general process, Ms. Howard testified that she entered properties for which Capital Crossing sought coverage onto a "Reporting Spreadsheet" that she maintained, updated Capital Crossing's internal loan database to show that the property was insured, and submitted that Reporting Spreadsheet at the end of each month to Capital Crossing's broker at the relevant time for submission to MAPFRE. SUF ¶ 133. Howard testified that she would then receive from Capital Crossing's broker an invoice for the month, listing MAPFRE's agent, Jaramillo, as payee, along with a spreadsheet showing the properties that were reported to MAPFRE. SUF ¶ 134. Howard testified that she then processed the invoice for payment through Capital Crossing's accounting department and mailed the checks once she received them from accounting. SUF ¶ 135.

Alma Ortiz, a MAPFRE underwriter who testified to working on the Capital Crossing account from approximately February 2017 to November 2017, testified that the purpose of the reports was so that Capital Crossing could "include the list[] of the repossessed properties so that [MAPFRE] could then charge them the appropriate premium," and that Jaramillo would calculate these premiums. SUF ¶ 138.

**L.   Capital Crossing's October 2017 Reporting, Including Reporting of Kopel Properties**

Israel Kopel (deceased) was the principal partner of PDCM LLC ("PDCM"), which is a special partnership that is in the business of buying, selling, and owning commercial and industrial real estate, and an owner of National Lumber.  SUF ¶ 139.  PDCM and National Lumber were part of what Capital Crossing referred to as the "Kopel Relationship."  SUF ¶ 140. At all relevant times hereto, Evelyn Rosario worked with Israel Kopel.  SUF ¶ 141.

The loans for the Phase I Properties of Borrowers PDCM and National Lumber were acquired by Bautista Cayman Asset Company on March 27, 2015 and December 30, 2016.  SUF ¶ 142.  On September 5, 2017 at 10:56 AM, Brian Doherty from Capital Crossing sent an email to Evelyn Rosario, requesting that she send "evidence of insurance for all the properties" and stated that it was an urgent request.  SUF ¶ 143.  During his deposition, Brian Doherty acknowledged that it was possible that his "urgent request" on September 5, 2017 related to the fact that Capital Crossing wanted evidence of insurance due to the threat of Hurricane Irma to Puerto Rico.  SUF ¶ 144.

That same day, on September 5, 2017, Brian Doherty exchanged internal emails about adding insurance coverage for several of the PDCM and National Lumber properties,

including the Phase I properties: 26987 (Plaza Aquarium); 26282 (Plaza Yabucoa); 27985 (Guayama Business Center); 27979 (Valle Real); and 27976 (PR-10, Km. 85.7) (collectively, the "Kopel Properties"). SUF ¶ 145. Doherty's request to add one of these properties -- Guayama Business Center -- was made at 11:01 a.m., five minutes after his 10:56 AM request for insurance to Evelyn Rosario, and included the following message:

> Jen,
> Would you please add FP coverage to the following properties; I've requested evidence of insurance from Borrower but not yet received.

SUF ¶ 146.

Jeffrey Anderson from Capital Crossing later represented that adding "forceplaced" coverage to the Kopel Properties was discussed on September 5, 2017, because "the Borrower did not provide evidence of insurance." SUF ¶ 147. On September 6, 2017, Hurricane Irma passed north of Puerto Rico, mostly avoiding the island. SUF ¶ 148.

### M.   The Phase I Properties

As stated supra Section I, the parties agreed that the largest 20 properties -- the Phase I Properties -- would be litigated first. The Phase I Properties consist of the following 20 properties:

| Property No. | Description | ID No. | Parties' Description |
|---|---|---|---|
| 1 | F&A Investment | 25744 | F&A |
| 2 | PDCM LLC | 26987 | Plaza Aquarium |
| 3 | PDCM LLC | 26282 | Plaza Yabucoa |
| 4 | PDCM LLC | 27985 | Guayama Business Center |
| 5 | Lago Esmeralda Developer | 27990 | Lago |
| 6 | Distribuidora Flamingo | 27664 | Distribudora |
| 7 | La Casa De Las Puertas | 25865 | La Casa |
| 8 | Ponce Real Estate Co. | 27509 | Ponce 53 Vives |
| 9 | Ponce Real Estate Co. | 27510 | Ponce 55 Vives |
| 10 | PDCM LLC | 27979 | Valle Real |
| 11 | Haras Santa Isabel | 25316 | Haras |
| 12 | Portico Del Sol Inc. | 26519 | Portico |
| 13 | Malave Heli Rivera | 25782 | Malave |
| 14 | Terra II MC&P Inc. | 27850 | Terra II |
| 15 | Ormo Development Corp. | 27222 | Ormo |
| 16 | Terrazas de Borinquen | 27963 | Terrazas |
| 17 | Kerry Nava Inc. | 27185 | Kerry Nava |
| 18 | National Lumber | 27976 | National Lumber |
| 19 | MOLLHA SE | 27732 | Mollha |
| 20 | Edna Torres Centeno | 27284 | Edna |

**N.    September 20, 2017 - Hurricane Maria Devastates Puerto Rico**

Hurricane Maria did not begin to form until the week of September 10, 2017.  SUF ¶ 149.  On September 20, 2017, Hurricane Maria made landfall on Puerto Rico, causing destruction throughout the island.  SUF ¶ 150.

By email dated September 29, 2017, Jennifer Howard emailed Desiree Vasquez, of NP Brokerage, stating "Attached is our reporting for September.  Please advise as to how the insurer will handle these additions, in regard to coverage."  Attached to the email was an excel spreadsheet titled "CCSC – Insurance Adjustments, 9/1/2017," which identified 37 total properties,

including the following seven Phase I Properties: (1) Plaza Aquarium; (2) Plaza Yabucoa; (3) Guayama; (4) Valle Real; (5) and (6) Ponce Real Estate (27509 and 27510); and (7) National Lumber.  SUF ¶ 151.

The Kopel Properties account for five of the seven Phase I Properties identified in the September 29, 2017, spreadsheet. SUF ¶ 152.  In the spreadsheet attached to Jennifer Howard's September 29, 2017, email, the following reported property values for the seven Phase I properties were: (1) $5,000,000 for the Plaza Aquarium property, (2) $4,700,000 for the Plaza Yabucoa property, (3) $1,340,000 for the Guayama property, (4) $4,600,000 for the Valle Real property, (5) $279,000 and $246,000 for the Ponce Real Estate properties, and (6) $950,000 for the National Lumber property.  SUF ¶ 153.

On October 3, 2017, Jennifer Howard emailed Desiree Vasquez of NP Brokerage, and stated: "[a]ttached is our corrected reporting for 9/30/2017."  Attached to the email was an excel spreadsheet titled "CCSC – Insurance Adjustments, 9/1/2017," which identified 43 total properties.  SUF ¶ 154.  The excel spreadsheet attached to Jennifer Howard's October 3, 2017, email did not make any changes with respect to any of the seven Phase I properties; the seven Phase I properties were included in both excel spreadsheets, and the amount listed in the "insured value" column for each property was exactly the same.  SUF ¶ 155.

On October 9, 2017, Desiree Vazquez of NP Brokerage sent Yuliana Laboy of Jaramillo an email with the subject "Capital Crossing / September 2017 Report on Repossessed Properties," stating the following:

Good Morning!

I hereby attach the report of the reported properties corresponding to the month of September.

| Type of Property | Number of properties | Values | Rate | Premium |
|---|---|---|---|---|
| Commercial | 351 | $93,516,305 | $0.042 | $58,307 |
| Residential | 94 | $20,404,271 | $0.025 | $ 5,836 |
| Liability Only | | | | $ 5,440 |
| Total of properties | 544 | $113,920,577 | | |
| Total Premium | | | | $69,583 |

Please send me the endorsement as specified.

Please let me know if you need any additional information.

Regards,

Attached to this email was an Excel file titled "Capital Crossing Monthly Report as of 09.01.2017.xlsx," in which Capital Crossing identified 43 additional properties, including the seven Phase I Properties identified above, under the heading "Changes Reported by the Insured as of 9/1/2017."  SUF ¶ 156. Through the October 9, 2017, email and report, CCSC sought to add 43 additional properties to the Policy (for a total of 544 properties identified to MAPFRE) and increase the total value of

properties under the Policy by $47,138,810, including the same
seven Phase I Properties identified above (five of which are
Kopel Properties), specifically:

| Borrower | Property ID | Address | Date Acquired | Insured Value |
|---|---|---|---|---|
| PDCM LLC | 26987 | Plaza Aquarium Mall. SW Corner PR-165 and PR-159, Quebrada Arenas Toa Alta PR | 3/27/2015 | $5,000,000 |
| PDCM LLC | 26282 | Plaza Yabucoa, PR 182 and PR 900, Yabucoa PR | 3/27/2015 | $4,700,000 |
| PDCM LLC | 27985 | Guayama Business Ctr., McArthur St (PR- 3), KM 139.9, Machete Ward, Guayama, PR | 12/30/2016 | $1,340,000 |
| PDCM LLC | 27979 | Valle Real Shopping Center, South of Rd PR-2 KM 2224.5, Canas Ward, Ponce, PR | 12/30/2016 | $4,600,000 |
| National Lumber | 27976 | PR-10 Km. 85.7 Tanama Ward, Arecibo, PR | 12/30/2016 | $950,000 |
| Ponce Real Estate Co. | 27509 | 53 Vives Street, Pueblo Ward, Ponce, PR | 9/28/2015 | $279,000 |
| Ponce Real Estate Co. | 27510 | 55 Vives Street, Pueblo Ward, Ponce, PR | 9/28/2015 | $246,000 |

SUF ¶ 157.

On October 17, 2017, Desiree Vasquez of NP Brokerage
emailed Jennifer Howard of CCSC and stated: "[a]ttached please

find September properties report invoices for . . . Capital
Crossing.  I also include the updated reporting table."  SUF ¶
158.  The "September properties report invoice" attached to
Desiree Vasquez's email to Jennifer Howard on October 17, 2017
was issued by Jaramillo to Capital Crossing on October 17, 2017,
eight days after Jaramillo received Capital Crossing's September
2017 property report from Desiree Vásquez.  SUF ¶ 159.

Jaramillo's October 17, 2017, invoice contained a chart
that included a column titled "Transaction," in which it stated
the phrase: "Policy Change."  SUF ¶ 160.  The invoice also
specified an effective date of 9/1/2017 and stated a premium
amount of $69,423.  Id.

The $69,423 premium specified in the October 17, 2017,
invoice was paid out of certain of the Purchasers' bank
accounts.  SUF ¶ 161.  NP Brokerage's October 17, 2017, email to
Jennifer Howard attached another invoice from Jaramillo to
Metropolitano Medical Holdings LLC.  The "Invoice Total" was for
$160.00.  The Description Column provided "Policy #CP200005675
02/20/2017-02/20/2018 . . . Package- End.#10 September Report
(Liability Only)."  SUF ¶ 162.

By email dated October 23, 2017, Gloria Ricard of Jaramillo
wrote to Desiree Vásquez of NP Brokerage and stated: "[a]ttached
invoice and Endorsement of September 2017 Liquidation[.]  Please
note that the premiums do not balance in the table you

submitted[.]  Check them and let me know so I can check[.]"  SUF
¶ 163.

That same day, Gloria Ricard of Jaramillo prepared
Endorsement No. 10.  SUF ¶ 164.  Endorsement No. 10 provided:

**COMMON POLICY DECLARATIONS**
For an additional/return premium, the items below are changed as indicated:

IT IS HEREBY UNDERSTOOD AND AGREED THAT AN ADDITIONAL PREMIUM OF
$49,818.00 IS DUE AS A RESULT OF THE LIQUIDATION REPORT FOR THE
MONTH OF SEPTEMBER 2017 ACCORDING TO THE FOLLOWING:

COMMERCIAL PROPERTY:
TOTAL VALUES FOR COMMERCIAL PROPERTIES: $93,516,305
TOTAL VALUES FOR RESIDENTIAL PROPERTIES: $20,404,271

$93,516,305 X $0.042 (MONTHLY RATE PER $100) =$39,277
$20,404,271 X $0.025 (MONTHLY RATE PER $100) =$5,101

COMMERCIAL GENERAL LIABILITY:
544 TOTAL PROPERTIES AT $10.00 = $5,440

TOTAL PREMIUM DUE: $49,818

*CERTIFIED TRUE COPY OF ORIGINAL DOCUMENTS*

SUF ¶ 165.

Two days later, on October 25, 2017, Jaramillo issued a
revised invoice to Capital Crossing.  SUF ¶ 166.  Jaramillo's
October 25, 2017, invoice contained a chart that included a
column titled "transaction" in which it stated as a "policy
change."  Id.  The invoice also specified an effective date of
10/1/2017 and specified a premium amount of $49,818.  Id.

Alma Ortiz, a MAPFRE underwriter who testified to working
on the Capital Crossing account from approximately February 2017
to November 2017, testified that "[t]he premium was calculated
by the underwriter of Jaramillo Insurance."  SUF ¶ 167.

On November 15, 2017, Sandra Alicea from Capital Crossing's new broker, Carrión, Laffitte & Casellas, Inc. ("HUB"), emailed Gloria Ricard from Jaramillo stating in relevant part:

> Regarding the September 2017 report, I took how it was in August and made the changes for September, below are the comments:
>
> - Note that the $113,920,577.49 report total included in the email does not include the additional cases in rows 555 through 597.  According to my analysis the correct total should be $162,170,387.46.
>
> - The Liability and Ownership premium should be $5,440 and $64,143 respectively according to the total of the report but they are not the same as the one in the summary table of the e-mail that you sent me or in the invoice.
>
> - According to my analysis, the summary of totals and billed premiums should have been as follows, as originally requested, but it does not add up because the $48,249,810 was not considered.  From the properties added on 9/1/17:

SEPTEMBER 2017 REVISED:

| Type of Property | Number of properties | Values | Rate | Premium |
|---|---|---|---|---|
| Commercial | 326 | $138,825,116 | $0.042 | $58,307 |
| Residential | 91 | $23,345,272 | $0.025 | $5,836 |
| Liability Only | 127 | | | $5,440 |
| Total of properties | 544 | $162,170,387 | | |
| Total Premium | | | | $69,583 |

SUF ¶¶ 168. 180.  Jaramillo subsequently issued Endorsement No. 11, rendering Endorsement No. 10 void, and charged Capital Crossing $69,583 in premiums.  SUF ¶ 169.

### O.    Hurricane Maria and Capital Crossing's Post-Hurricane Insurance Claims

As stated above, on September 20, 2017, Hurricane Maria struck Puerto Rico causing destruction throughout the island. SUF ¶ 170.  Luis Negrón, Senior Vice President at MAPFRE, testified to the following conditions after Hurricane Maria:

> At that time in Puerto Rico, there was no power.  I myself was without power for 99 days and two months without water.  Likewise, people were without power for six to eight months, a great part of the population.  And this obviously created an extremely complicated environment.  Communications antennas had been blown off, so there was very limited cellphone service, limited email service.  Many roads were impassable.  Some bridges had gone down.  There was no hotels available, no food, and no cash.  In order to be able to work at Mapfre at that time, it was necessary to create a daycare for the children of our employees, because our employees couldn't come to work.  They had no -- there was no water or power or food at home, so we were feeding employees and their children breakfast, lunch and dinner.  In addition to that, the engineering group and the adjusters were working in the company.  We established a laundry for employees.  We even established a barber shop and a beauty parlor for our male and female employees.  We provided power generators to employees at cost.  The company had been able to purchase a large number and provided them at cost to employees.  We also set up a water oasis, with it was under those circumstances that employees were able to work, and even then it was a limited schedule because there was a 7 p.m. curfew.  And that's just half the story.  It was a lot worse than just that, a lot more things happened.

SUF ¶ 171.  Negrón also testified that MAPFRE handled insurance claims supporting Puerto Rico's infrastructure, testifying as follows:

At that time I just -- so that you can understand the
situation that we had in Mapfre, we were handling the
claims for the airport, for the Ports Authority, for
the Puerto Rico Highway and Transportation Authority,
for the Puerto Rico Electric Power Authority, PREPA,
for the Puerto Rico Aqueduct and Sewer Authority,
PRASA, for EcoEléctrica, and these are just some of
the claims.  So obviously -- oh, and also the Public
Housing Authority, which involved 600 buildings
throughout the island.

SUF ¶ 172.

On October 3, 2017, Capital Crossing received from Israel

Kopel ("Kopel") a copy of the borrower's insurance policies for

the Kopel Properties, including the following Phase I

properties:

| Name | Address |
|---|---|
| PDCM LLC | Valle Real Shoping Center, South of Rd PR-2 KM 2224.5, Canas Ward |
| PDCM LLC | Guayama Business Ctr, McArthur St (PR-3), KM 139.9, Machete Ward |
| PDCM LLC | Plaza Yabucoa, PR 182 and PR 900 |
| PDCM LLC | Plaza Aquarium Mall. SW Corner PR-165 and PR-159, Quebrada Arenas |
| National Lumber | PR-10 Km 85.7 Tanama Ward |

SUF ¶ 173

On October 5, 2017, Jennifer Howard from Capital Crossing

sent MAPFRE a letter dated September 29, 2017, stating the

following:

Dear Sir or Madam:

As you know, commercial and residential properties on
Puerto Rico have incurred substantial losses and
damages as a result of Hurricane Maria.  Attached is a
list of properties for which Capital Crossing
Servicing Company LLC ("Capital Crossing") is insured
under the above-referenced policies.  A copy of this
property list was previously provided to our broker,
Noemi Perez Insurance Partner, LLC.  Please accept
this letter as notification of losses and damages
incurred at, or in connection with, the vast majority
- if not all - of the properties identified on the
attached list.  We look forward to working with you
and our broker, Noemi Perez Insurance Partner, LLC, on
the successful resolution of the losses that Capital
Crossing has incurred and any claims that may be
asserted against Capital Crossing.  Your immediate
attention is appreciated.

SUF ¶ 174.  Together with the letter dated September 29, 2017,

Capital Crossing sent MAPFRE what it characterized as "a list of

properties . . . insured under the [Policy]" ("List of

Properties").  SUF ¶ 175.  On October 9, 2017, Vázquez emailed

Jaramillo, attaching a letter dated September 29, 2017, from

Jennifer Howard, which included "a list of properties for which

Capital Crossing Servicing Company LLC ('Capital Crossing') is

insured under the above-referenced policies," and stating

"Please accept this letter as notification of losses and damages

incurred at, or in connection with, the vast majority—if not

all—of the properties identified on the attached list."

SUF ¶ 176.  Included in this list attached to Vázquez's October

9, 2017 email were the 43 properties (and their stated value of

$47,138,810) Capital Crossing sought to add to the Policy

through her October 9, 2017 email and Capital Crossing's report,

including the seven Phase I Properties identified above.  SUF ¶ 177.

On October 12, 2017, Brian Doherty of Capital Crossing sent an internal email to Ted Mehm, forwarding copies of the Kopel insurance policies and saying, "I've left force-place coverage in place until we're fully satisfied with the coverage Kopel has provided."  SUF ¶ 178.

On October 16, 2017, Luis Guzmán from Capital Crossing sent an internal email with the subject "Kopel Insurance," referencing a conversation with Evelyn Rosario of PDCM and stating, "After reviewing the policies submitted by the Borrower, it seems that coverage is adequate for the mortgage properties."  SUF ¶ 179.  On October 20, 2017, Capital Crossing retained a new Puerto Rican broker, HUB.  SUF ¶ 180.

On November 9, 2017, and December 26, 2017, Jeffrey Anderson sent Israel Kopel letters concerning the Phase I PDCM and National Lumber properties, referencing the borrower-obtained insurance policies, and demanding that "the Creditor" be "included as a recipient/payee of all insurance proceeds that are disbursed in connection with claims asserted under the Policy."  SUF ¶ 181.  In November and December 2017, Jeffrey Anderson sent twelve separate letters on behalf of Capital Crossing Puerto Rico LLC to the following borrowers for the Phase I properties stating, among other things, that their loan

is "serviced by the undersigned, Capital Crossing Puerto Rico LLC:"

| **Name** | **Address** |
|---|---|
| PDCM LLC | Valle Real Shopping Center, South of Rd PR-2 KM 2224.5, Canas Ward |
| PDCM LLC | Guayama Business Ctr, McArthur St (PR- 3), KM 139.9, Machete Ward |
| PDCM LLC | Plaza Yabucoa, PR 182 and PR 900 |
| PDCM LLC | Plaza Aquarium Mall. SW Corner PR-165 and PR-159, Quebrada Arenas |
| National Lumber | PR-10 Km 85.7 Tanama Ward, Arecibo, PR |
| Distribuidora Flamingo | 204 & 206 Ponce de Leon Ave, Puerta de Tierra, San Juan |
| Edna Torres Centeno | Marginal St. corner of Monterrey Street, Reparada Ind. Park, Canas Ward, Ponce, PR |
| Haras Santa Isabel Inc. | PR-14 Km 23.6, Llanos Ward, Coamo PR |
| Mollha, SE | 571 Ponce de Leon Ave. Hato Rey Ward, San Juan, PR |
| Ponce Real Estate Co. | #53, Vives St., Pueblo Ward, Ponce PR |
| Ponce Real Estate Co. | #55, Vives St., Pueblo Ward, Ponce PR |
| Porticos Del Sol Development | Porticos del Sol PR-859 Km. 1.3, Santa Cruz Ward, Carolina PR |

SUF ¶ 182.

On November 29, 2017, Capital Crossing's broker emailed Luis Negrón, Ivette González Beauchamp, and Rafael Rivera of MAPFRE, requesting "acknowledgement that CCPR is doing everything under our control to take reasonable efforts to

protect the properties as lienholder." SUF ¶ 183. MAPFRE responded to the November 29, 2017 email the next day, stating, "we cannot make that statement because we do not know what CCPR is doing to protect the properties." SUF ¶ 184

In December 2017, Capital Crossing's broker emailed Luis Negrón of MAPFRE, and Mario Oliveras, an engineer and outside contractor who at that time was serving as a MAPFRE claims adjuster, attaching a spreadsheet titled "Capital Crossing Servicing Company LLC; Policy #54-CP-200005675 (Mapfre); Force Placed Policy list–(based on September 2017 Report)." SUF ¶ 185.

Between December 20, 2017 and December 21, 2017, Jeffrey Anderson and Brian Doherty of Capital Crossing had the following internal email exchange:

> Brian,
>
> This is the insurance adjuster/engineer from Mapfre. They are going through the portfolio and inspecting all assets with forced placed insurance where we have evidence of damage to complete the claim. Since we now have evidence of borrower placed insurance we may want to tell the engineer that we are filing a claim under the borrower['s] policy and his inspection is not necessary.
>
> Jeff
> . . .
>
> Jeff,
> David and I were discussing and think it may be worthwhile to dual track our insurance claim with

> Kopel's, as a belt and suspenders approach, plus we'll
> have more data if a claim dispute arises.  Thoughts?
>
> Thanks,
> Brian
>
> . . .
>
> This strategy makes sense.  We can also run this
> strategy by Affiliated Adjusters who will [b]e
> assisting with our force placed claims.

SUF ¶ 186.

Capital Crossing did not tell MAPFRE at that time that borrower-placed insurance policies existed pertaining to the Kopel properties, nor that Israel Kopel had submitted claims for insurance under these policies.  SUF ¶ 187.

In January 2018, Capital Crossing retained Affiliated Adjustment Group, Ltd. Corporation ("AAG") "to advise and assist in the preparation, presentation and adjustment of the claims for the loss or damage by Maria . . . sustained on or about September 20, 2017" and agreed to pay AAG "a fee equal to seven and one half percent (7.5%) of the amount of the loss paid by [MAPFRE] (regardless to who said loss is payable) for any properties referred to AAG by Capital Crossing and for which AAG renders the Services."  SUF ¶ 188.

MAPFRE and AAG performed several joint inspections during February 2018, after which, on March 16, 2018, AAG made its first claim submission.  SUF ¶ 189.  AAG's claims submissions were added to a single spreadsheet as they were submitted to

MAPFRE; that is, all prior claim submissions were reflected in the latest claim submission.  SUF ¶ 190.

The claims by AAG as to the Phase I Properties were as follows:

| Borrower | Property ID | Net Claim Amt. w/ loss ceiling | Claim Sub-mission # | Date |
|---|---|---|---|---|
| PDCM LLC | 26987 | $4,500,844.58 | CS1 | 3/16/18 |
| PDCM LLC | 26282 | $2,248,958.47 | CS3 | 5/4/18 |
| Lago Esmeralda Developer | 27990 | $1,852,893.72 | CS1 | 3/16/18 |
| F&A Investment | 25744 | $1,489,574.71 | CS1 | 3/16/18 |
| PDCM LLC | 27985 | $1,340,000.00 | CS5 | 5/29/18 |
| PDCM LLC | 27979 | $976,801.63 | CS1 | 3/16/18 |
| Distribuidora Flamingo | 27664 | $717,947.00 | CS1 | 3/16/18 |
| La Casa De Las Puertas | 25865 | $715,000.00 | CS3 | 5/4/18 |
| Malave Heli Rivera | 25782 | $670,965.35 | CS2 | 4/19/18 |
| Portico Del Sol Inc. | 26519 | $666,005.91 | CS3 | 5/4/18 |
| Ormo Development Corp. | 27222 | $570,377.58 | CS1 | 3/16/18 |
| Terra II MC&P Inc. | 27850 | $568,049.59 | CS1 | 3/16/18 |
| Terrazas de Borinquen | 27963 | $488,956.29 | CS1 | 3/16/18 |
| Kerry Nava Inc. | 27185 | $433,007.08 | CS13 | 11/14/18 |
| Haras Santa Isabel | 25316 | $400,000.00 | CS9 | 8/14/18 |
| National Lumber | 27976 | $381,672.14 | CS3 | 5/4/18 |
| Ponce Real Estate Co. | 27509 | $279,000.00 | CS4 | 5/11/18 |

| Ponce Real Estate Co. | 27510 | $246,000.00 | CS4 | 5/11/18 |
| MOLLHA SE | 27732 | $188,741.72 | CS12 | 10/18/18 |
| Edna Torres Centeno | 27284 | $118,564.65 | CS6 | 6/18/18 |

SUF ¶ 190.

On February 20, 2018, Capital Crossing sent an email to Israel Kopel and Evelyn Rosario of PDCM/National Lumber to confirm the matters discussed during their recent meeting, including that they would "[k]eep Bautista/Capital Crossing informed on the insurance claims." SUF ¶ 192. On March 26, 2018, Luis Guzmán from Capital Crossing sent Jeff Anderson from Capital Crossing a "copy of the [insurance] claims made by Kopel," which Mr. Anderson then forwarded to Antonio Casellas at HUB, copying Ted Mehm and Luis Guzmán at Capital Crossing. SUF ¶ 193. On May 8, 2018, David FitzPatrick of Capital Crossing wrote to Luis Negrón of MAPFRE and Mario Oliveras, an engineer and outside contractor who at that time was serving as a MAPFRE claims adjuster, saying (among other things) "to date Capital Crossing (together with Affiliated Adjusters) have submitted 135 individual claims to MAPFRE under our forced placed policy #54-CP-200005675-0" and "you have agreed to provide (through Ivette Gonzales of MAPFRE) claim numbers for all 435 properties under our Forced Placed policy monthly report as of 10/1/17." SUF ¶ 194.

Mario Oronoz was an outside attorney who was issued a provisional license as an adjuster following Hurricane Maria. SUF ¶ 195.  Mr. Oronoz was retained by MAPFRE to serve as an independent adjuster on Capital Crossing's claims.  Id.  Mr. Oronoz had worked on "over 60" claims as a claims adjuster for MAPFRE before he had started adjusting Capital Crossing's claim. Id.

On May 15, 2018, Matthew Dickson, of Affiliated Adjustment Group Ltd., emailed Mario Oronoz saying:

> Pursuant to our conversation and your e-mail below, I would like to confirm that Affiliated will **not**, as of now, send you any information that Mario Oliveras had previously requested.  Mario Oliveras had asked for any appraisals and/or inspection reports on file relating to claim submissions made.  However, we are ready and waiting to send all of this information to you upon your request, should you deem it necessary.  Please note the nature in which Capital Crossing does business (bulk loan purchasing) these reports are not necessarily available for all properties.

SUF ¶ 196 (emphasis original); SUF ¶ 269.  Rafael Rivera of MAPFRE was cc'd on this email correspondence.  SUF ¶ 196.

On May 17, 2018, Mario Oronoz responded to Matthew Dickson's May 15, 2018, email, cc'ing Luis Negrón and Rafael Rivera of MAPFRE, among others, and stating "I acknowledge receipt of your email.  I am not quite sure what you are referring to, so I will not respond until I we (sic) have a chance to get together and discuss the referred-to matter."

SUF ¶ 197.

In June 2018, Capital Crossing and MAPFRE settled the claim for the National Lumber property that is part of the Phase I Properties for $242,152.99.  SUF ¶ 198.

In August 2018, Mr. Kopel advised Capital Crossing that he had settled his approximately $64 million claim with Real Legacy for $28 million.  SUF ¶ 199.  Mr. Kopel later testified that his approximately $64 million claim was based on "cost of repairs after a hurricane that are typically 30 to 40 to 50 percent higher than normal," and that his decision to accept $28 million to settle the claim was "a business decision based on negotiation.  And based, of course, on our experience on how much we think we can do repairs for."  SUF ¶ 200.[9]

On August 15, 2018, Jeffrey Anderson from Capital Crossing sent an internal email with an attachment titled "PDCM Associates Overview 08/15/2018" stating that PDCM had reportedly settled with its insurer for $28,000,000 and that "Kopel believe[d] he should be getting paid within the next two weeks." SUF ¶ 201.

Mr. Anderson, testifying as Capital Crossing's Federal Rule of Civil Procedure 30(b)(6) designated witness, stated during his deposition:

---

[9] While the parties submit this quote as undisputed, there is no record reference associated with the statement of fact.

Q. . . . did you ever disclose to Mapfre Praico, you being Capital Crossing, disclose to Mapfre Praico that Kopel had settled with his insurers for $28 million?

A. No.

Mr. Insua: Objection

A. No, because I don't think we ever had evidence of that settlement, other than a verbal discussion that one of the relationship officers would have had.

Q. But you didn't relay that verbal discussion to Mapfre Praico, did you?
. . .
A. It's fairly subjective.  No.

Q. You did not relay that discussion to Mapfre Praico?

A. The subjective discussion with a nonperforming borrower, I don't think we would have relayed that.

SUF ¶ 202.  Capital Crossing did not participate in any settlement or claims negotiations concerning the Real Legacy Policy and claims that it did not "see[] any of those insurance proceeds" under the Real Legacy policy.  SUF ¶ 203.

Jeffrey Anderson, again testifying on behalf of Capital Crossing, testified as follows:

Q.  Were certain members of Capital Crossing or employees of Capital Crossing meeting with Kopel concerning his insurance claims?

A.  Yes.  Members from our team meet Kopel on a regular basis, as he is one of our largest borrowers, and we're trying to collect from him.

Q.  Okay.  How frequently?

> A.   It depends on what's going on with the loan, but,
> you know, we try to every several weeks.  That has
> stopped recently due to Covid.
>
> Q.   Who from Capital Crossing met with Kopel?
>
> A.   Typically it's Luis Guzman who meets with Kopel.
>
> Q.   Did -- was Capital Crossing made aware that
> insurance payments had, in fact, been made to Kopel?
>
> A.   I believe that we were aware that payments were
> made, but we were not aware that they were made on our
> properties, the properties securing our loans.

SUF ¶ 204.  Mr. Anderson also testified that Mr. Kopel has not

provided an allocation showing that his settlement proceeds were

applied to the Kopel properties relevant in this action.  SUF ¶

205.

Mr. Kopel testified that PDCM was paid the $28,000,000

settlement from the insurer and that they received a bulk

payment rather than a payment per property.  SUF ¶ 206.  Mr.

Kopel testified: "We made a claim to the properties that had

damage, and we were paid for the damage, and we repaired the

damage on all the properties."  SUF ¶ 207.

On October 4, 2018, Luis Guzmán emailed Jeffrey Anderson

stating that Israel Kopel had "just called [him]" and that Mr.

Kopel "mentioned that he has repaired approximately 80% of the

damage on the properties under [Capital Crossing's] portfolio

from his own resources."  SUF ¶ 208.

Capital Crossing conducted inspections of the PDCM and National Lumber properties multiple times per year and was aware of repairs made by the borrower to those properties.  SUF ¶ 209. Mr. Anderson, testifying as Capital Crossing's 30(b)(6) witness, stated during his deposition:

> Q.  What was the extent of the repairs that Capital Crossing observed to the property, the Kopel properties?  You can answer, Mr. Anderson.
> . . .
> A.  I'm not a construction expert.  That's why we hired Affiliated.
>
> Q.  So you have no idea?
>
> MR. INSUA: Objection.
>
> Q. Answer the question.  You can answer.
>
> A.  Yeah, I'm not a construction expert.
>
> Q.  You don't need to be construction expert to go to a property to see if it's been repaired.
>
> MR. INSUA: Same objections.
>
> A.  (No response.)
>
> Q.  So you're unable to provide any testimony about the extent of the repairs that you observed during your site inspections?
>
> A.  That's correct.  I'm not a construction expert.  I don't know the extent of the repairs that were made.
>
> Q.  Looking at Exhibit 15, there is an email from Luis Guzman to you dated October 4, 2018, Subject: Kopel. He references a call from Kopel in that first sentence.  Do you see that?
>
> A.  Yeah.

Q.  It states that "he informed the following."  You
see that?

A.  Yes.

Q.  In the last bullet "he mentioned that he prepared
approximately 80 percent of the damage on the
properties under our portfolio from his own
resources."  Do you see that?

A.  I do.

Q.  Does Capital Crossing have any basis to dispute
that this statement [that Mr.Kopel repaired
approximately 80 percent of the damage on the
properties from his own resources] is accurate?

A.  Yeah.  Israel Kopel is not a construction expert.
He may have just wanted to put duct tape on it fix
immediate repairs, but not return the property to its
original state.

Q.  Okay.  During your inspections, did you observe
that is the case?

A.  Again I'm not a construction expert, that's why we
are relying on the experts at Affiliated Adjustors.
. . .
Q.  You have no basis to dispute that statement,
outside of any anything from Affiliated Adjustors,
right?

Mr. Insua: Objection.  Asked and Answered.

A.  I have no basis to believe that that statement is
accurate from Israel Kopel.

Q.  Did Capital Crossing follow up on this claim to
see if it was accurate?

MR. INSUA: Objection.

A.  We're relying on Affiliated Adjustors to look at
the extent of the damage.

Q.  My question is, around the time of this email,
which is October 4th, 2018, did Capital Crossing

follow up to determine if Israel Kopel's statement about repairing 80 percent of the damage to the property was accurate?

A.  Follow up with who?

Q.  Follow up in any way.

A.  So you've got to remember, right, this email – what's the date of it?

Q.  It's October 4th, 2018.

A.  Okay.  A year after the storm, and your client still had not made any payments out to anybody, you know, the borrowers – the owners of the properties were forced to go and dig into their pockets and make any necessary repairs.  So, yeah, I'm sure he made some repairs.  It's not to the same level as it was before.

SUF ¶ 210.  Capital Crossing did not tell MAPFRE about its observations of borrower repairs at the PDCM and National Lumber properties at that time.  SUF ¶ 211.

Capital Crossing's representatives and MAPFRE's representatives jointly inspected the four PDCM Kopel Properties after October 4, 2018.  (The parties had already settled the National Lumber Kopel Property that is part of Phase I Properties).  SUF ¶ 212.

As of October 2018, HUB and its Vice President, Nicole Hernandez Garcia, were assisting Capital Crossing with its insurance claim with MAPFRE.  SUF ¶ 213.  On October 30, 2018, Katia Vale Guerra from MAPFRE sent an email to Nicole Hernandez from HUB requesting that she identify the date of acquisition of

each of the properties allegedly added to the Policy in September 2017.  SUF ¶ 214.

On December 14, 2018, Rafael Rivera from MAPFRE sent an email to Jeffrey Anderson from Capital Crossing attaching a spreadsheet "based on all the risks that Capital Crossing informed MAPFRE [it] wanted to insure[] for the month of September 2017," and requesting:

> Columns H, I and J represent Capital Crossing underwriting submissions for the months of August, September and October respectively.  Therefore, for those locations that are not marked YES in column H, [Capital Crossing] must provide information and documentation as to when the prior insurance policy expired.
> . . .
> For those locations that are not marked YES in column J, [Capital Crossing] must provide information and documentation as to when it[s] insurable interest ceased.

SUF ¶ 215.

On December 26, 2018, Capital Crossing's broker, HUB, sent MAPFRE a list that purported to identify, among other things, the date of acquisition of the 43 properties allegedly reported to MAPFRE for September 2017.  SUF ¶ 216.

On January 17, 2019, Rafael Rivera of MAPFRE emailed Capital Crossing's broker saying, "There are 168 properties that are marked as Not Inspected.  I hereby confirm that said properties have not been inspected due to lack of formal access to said properties, which is been sought through legal action.

We await insured's information as to when access will be granted
in order to schedule joint inspections." SUF ¶ 217. In the
same January 17, 2019 email, Mr. Rivera from MAPFRE reiterated
MAPFRE's December 14, 2018, requests for information and
documents. SUF ¶ 218.

On January 28, 2019, Matthew Dickson emailed Rafael Rivera
of MAPFRE, saying "We have been granted access to a property in
the portfolio for an inspection on Wednesday at 11:00 a.m. . . .
As the inspection is Wednesday it's important we hear back from
you or someone from your team as soon as possible so we can
confirm with the borrower." SUF ¶ 219. On February 27, 2019,
Rafael Rivera sent an email to Antonio Casellas from HUB again
requesting "information as to when prior insurance expired" and
"information as to when Capital Crossing's insurable interest
ceased" as to properties that were allegedly added to the Policy
in September 2017, stating, "[n]o adjustment will be provided
and considered final until the information requested is
provided, as this information is critical to the adjustment
process. SUF ¶ 220.

Edgar Collado was hired by MAPFRE to coordinate inspections
of properties. SUF ¶ 221. On March 15, 2019, Edgar Collado
emailed Matthew Dickson, cc'ing Rafael Rivera of MAPFRE, saying
"please provide us with a list of the mentioned 80 properties

that await court order approval for inspecting them." SUF ¶ 222.

On April 5, 2019, counsel for Capital Crossing sent a letter to Alexis Sánchez and Rafael Rivera of MAPFRE, stating that the Policy "provides property insurance coverage for foreclosed dwellings and commercial properties securing loans anywhere on the island of Puerto Rico", and, among other things, demanding that MAPFRE "immediately withdraw, in writing[,] its 'late-reporting' coverage defense" and issue "full and immediate payment . . . on the 1st Claims Submissions, the 2nd Claims Submissions and the 3rd Claims Submissions." SUF ¶ 223

On April 9, 2019, Capital Crossing had "received a check in the amount of $175,928 for Kopel's insurance claim on one of the National Lumber loans," filed under the Multinational policy, and that "we are still waiting for the $800k +/- on the Real Legacy policy." SUF ¶ 224. Capital Crossing services multiple National Lumber properties, and the parties dispute whether the $175,928 payment was made for a National Lumber property that is part of the Phase I Properties. Mr. Anderson, testifying as Capital Crossing's 30(b)(6) witness, said the "to the best of [his] knowledge," Capital Crossing did not disclose to MAPFRE that it received the $175,928 payment at that time. Id. Capital Crossing applied the $175,928 insurance payment to the borrower's loan balance. SUF ¶ 225.

Capital Crossing's 30(b)(6) witness testified that Mr.
Kopel "requested the insurance proceeds get applied to the
principal balance.  We [Capital Crossing] would have followed
the loan documents, and if the document stated the insurance
proceeds should be applied to the loan, because it's current,
then that's what we would have done."  SUF ¶ 226.

In addition to paying Capital Crossing's claim for the
National Lumber property that is part of the Phase 1 Properties,
MAPFRE paid claims on four other non-Phase 1 properties that
were first reported to MAPFRE on the September 2017 report.  SUF
¶ 227.

On May 2, 2019, counsel for MAPFRE sent a letter to Capital
Crossing's counsel responding to Capital Crossing's April 5,
2019 demands, and stating, among other things, that MAPFRE had
"requested specific information about certain properties
included in the underwriting submissions for August 2017,
September 2017 and October 2017" and that "[t]his
information is critical to the adjustment process."  SUF ¶ 228.

On May 31, 2019, Rafael Rivera for MAPFRE, sent Capital
Crossing, through its counsel, a letter requesting that, for the
43 properties "first reported in October 2017, as purportedly
acquired in September 2017," the following:

> 1. For each of these properties, state whether they
> were acquired by the insured through repossession,

foreclosure, deed in lieu of foreclosure or as
mortgagee in possession;
2. The date on which each of these properties was
acquired by the insured as described above;
3. The date on which other specific insurance over
these properties lapsed or, conversely, the date on
which other specific insurance attached;
4. Copies of the documents that support the
information to be provided as required above.

SUF ¶ 229.

On June 12, 2019, Luis Negrón from MAPFRE sent a letter to
Jeffrey Anderson from Capital Crossing "reiterat[ing] MAPFRE's
prior requests for documents and information," and requested
that by June 19, 2019, Capital Crossing provide the information
requested in its May 31, 2019 letter, and provide three dates in
June for an examination under oath.  SUF ¶ 230.

### P.    The Parties Engage Counsel

On July 2, 2019, Capital Crossing's counsel emailed MAPFRE
and its counsel saying:

> We write in response to the below-referenced letter to
> Jeff Anderson of Capital Crossing, which referred to a
> May 31 letter to Finley and me of this firm, regarding
> the "September-reporting" issue. . . .

> [I]n the interest of responding to MAPFRE's requests
> for information, we have focused on the six properties
> subject to the "September-reporting" issue that are
> also among the 20 largest claims . . . . Of those six,
> two are owned by Ponce Real Estate . . . and four are
> owned by PDCM.

> For PDCM, despite multiple requests, the borrower did
> not provide evidence of insurance coverage.  Per the
> attached email, Capital Crossing reported the four
> properties, Plaza Aquarium, Plaza Yabucoa, Guayama
> Business Center, and Valle Real Shopping Center when,

on September 5, 2017, Capital Crossing's Relationship
Officer made a request to Capital Crossing's Insurance
Coordinator to force place the insurance . . . . The
Insurance Coordinator included the properties in the
monthly report that was sent Mapfre, with an effective
date of September 1, 2017, and the properties were
endorsed onto the Mapfre policy, also effective
September 1, 2017.  There was no other insurance for
these properties of Hurricane Maria.

. . .

Capital Crossing later learned that three of the four
PDCM properties were insured under a policy sold by
Real Legacy Assurance Company ("Real Legacy")
(separately attached because of volume) (the Insured
Properties are Plaza Aquarium, Plaza Aquarium, Plaza
Yabucoa, and Valle Real Shopping Center; not
insured under the policy was Guayama Business Center),
which expired in January 2018.  Capital Crossing was
not a named insured, an additional insured, or a loss
payee on the Real Legacy policy.  Real Legacy was
placed into insolvency in January 2019.  Moreover,
nothing was recovered under the Real Legacy policy for
Plaza Aquarium, Plaza Yabucoa, or Valle Real Shopping
Center.  The fourth PDCM property, the Guayama
Business Center, was insured under a policy sold by
Multinational Insurance Company (separately attached
because of volume), which expired in May 2018.
Capital Crossing was likewise not a named insured, an
additional insured, or a loss payee on the
Multinational policy.  There also was no recovery
under the Multinational policy for the Guayama
Business Center.

SUF ¶ 231.  MAPFRE's counsel acknowledged receipt of Capital

Crossing's counsel's July 2, 2019, email attaching the Real

Legacy Policy and the Multinational Policy.  SUF ¶ 232.

The Real Legacy Policy covered:

[a]ll real and personal property of every kind and
description owned, used leased or intended for use
including but not limited to improvement and
betterments, property of others in the care, custody

and control of the insured or for which the insured
responsible to insure or has agreed to insured,
property of the insured the care custody and control
of others, property in the course of construction,
personal property of the insured's officers employees
and representatives, accounts receivable, valuable
papers and records, electronic data process equipment
and media (including full cost of reproduction), extra
expense contractors/ subcontractors and vendors
interest, stock, soft costs; expediting expenses, fine
arts, leasehold interest, attraction property,
royalties, research and development cost, fines and
penalties and/or as may be fully defined in the policy
wording.

SUF ¶ 233.

The Real Legacy Policy stated, "[o]ur maximum Limit of Insurance in any one occurrence at any one premise for all subjects of insurance stated and losses or damages arising out of any one occurrence shall not exceed the amount of $30,000,000, (First Loss Limit) excess all applicable deductibles." SUF ¶ 234. The Real Legacy Policy includes a chart titled "Statement of Values" that includes 61 properties, including the three of the four PDCM properties at issue in Phase I of this litigation, namely Plaza Aquarium (ID No. 26987), Plaza Yabucoa (ID No. 26282), and Valle Real (ID No. 27979) (collectively, the "RL Properties"). SUF ¶ 235. The combined value of the properties listed in the Real Legacy Policy's "Statement of Values" chart was $341,325,000. SUF ¶ 236. In fact, the combined value of just two properties exceeded the $30 million in limits. SUF ¶ 236.

The Multinational Policy was issued to PR Retail Stores, Inc. and includes a chart titled Statement of Value 2017, which identifies various properties including the National Lumber property at issue in Phase I of this litigation, and the PDCM property at Guayama Business Center.  SUF ¶ 237.  The National Lumber and Guayama Business Center Phase I Properties are identified in the Multinational policy's Declarations, each with its own "Amount of Insurance" specified.  SUF ¶ 238.  The Multinational Policy provides numerous coverages, including, among others, property, and inland marine.  SUF ¶ 239.  The Multinational Policy has a "Loss Payable Provisions" Supplemental Form, which identifies ten properties and for each includes the name of a loss payee.  SUF ¶ 240.  For "Covered Property in which both [the named insured] and a Loss Payee have an insurable interest:" Multinational agreed to pay "for covered loss or damage to each Loss Payee in their order of precedence, as interests may appear."  SUF ¶ 240.

**Q.    The Massachusetts Action Filed By Capital Crossing**

On July 18, 2019, MAPFRE was served with a summons in connection with the case captioned Capital Crossing Servicing Company LLC v. MAPFRE PRAICO Insurance Company, No. 19-cv-11157 (D. Mass.) ("the Massachusetts Action"), which Capital Crossing had filed on May 21, 2019.  Doc. Nos. 1, 6 of Massachusetts Action.  SUF ¶ 241.

### R.    Capital Crossing Files Complaint With Puerto Rico Insurance Commissioner and the Instant Action

On September 17, 2019, Capital Crossing filed a form with the Puerto Rico Insurance Commissioner alleging bad faith claims handling on the part of MAPFRE, pursuant to 26 L.R.P.A. § 2716d(3).  SUF ¶ 242.  Capital Crossing had provided MAPFRE a copy of that form the day before.  SUF ¶ 243.  The Insurance Commissioner did not return the form Capital Crossing submitted or take any other action.  SUF ¶ 244.

On September 17, 2019, Capital Crossing also filed its Complaint in this Action.  SUF ¶ 245.

On March 13, 2020, Capital Crossing made a document production which included an email, bates-labeled CCSC005855, from Jeff Anderson stating that, "We received a check in the amount of $175,928 for Kopel's insurance claim on one of the National Lumber loans."  SUF ¶ 246.

Capital Crossing's document production also included copies of the Real Legacy and Multinational Policies to MAPFRE's counsel on March 13, 2020, bates-labeled CCSC004838-CCSC005046 and CCSC008067-CCSC008311 respectively.  SUF ¶ 247.  On March 13, 2020, Capital Crossing also produced the service letters. SUF ¶¶ 182, 248.

On March 13, 2020, Capital Crossing also produced the following interrogatory response:

**INTERROGATORY NO. 7:**
For each property that is the subject of Phase 1
discovery, please state:
a) The date on which you acquired title to and/or
foreclosed on the property, indicating in your answer
if the property was acquired by repossession,
foreclosure, deed in lieu of foreclosure, or as
mortgagee in possession;
b) The date on which other specific insurance over
these properties lapsed or, conversely, the date on
which other specific insurance attached, including in
your answer information about such other insurance
such as the name of the insurance company and policy
number;
c) The date on which you or your representatives first
reported the property to MAPFRE PRAICO in accordance
with the provisions of the Foreclosed Coverage
(Reporting Form) contained in the policy;
d) The amount of loss or damage claimed under the
policy for the particular property;
e) The date on which the parties reached an agreement
on the amount of loss or damage for the particular
property, or the date oy (sic) any appraisal award for
that property; and
f) Identify all documents related to the previous
subparts (a) through (e).

**RESPONSE TO INTERROGATORY NO. 7:** Capital Crossing
objects to this Interrogatory on the grounds that the
Interrogatory is compound and overbroad, that
identification of information responsive to this
Interrogatory would be unduly burdensome, and that
this Interrogatory seeks information that is not
relevant to the subject matter of this action.
Capital Crossing further objects to this Interrogatory
to the extent the Interrogatory seeks information in
the possession of, equally available to, or more
appropriately and conveniently obtained from, other
persons, entities or MAPFRE, including MAPFRE's agents
and representatives.  Subject to and without waiving
any general or specific objection, Capital Crossing
responds that it will produce documents containing
information responsive to this request.

SUF ¶ 249.

On or about April 20, 2020, Capital Crossing served
responses to MAPFRE's First Set of Requests for Production of
Documents stating, in part, as follows:

> **REQUEST NO. 14:** Each insurance policy, other than the
> Policy, that provided, or may have provided, coverage
> for any of the Properties in 2017.
>
> **RESPONSE NO. 14:** Capital Crossing objects to this
> request to the extent it is overbroad, unduly
> burdensome, and seeks information not reasonably
> calculated to lead to the discovery of admissible
> evidence.  Subject to and without waiving any general
> or specific objection, Capital Crossing responds that
> it is not aware of any insurance policy that did
> provide, or would have provided, coverage for any of
> the Properties for loss or damage sustained as a
> result of Hurricane Maria.…
>
> **REQUEST NO. 16:** Documents sufficient to identify the
> date you acquired each of the Properties.
>
> **RESPONSE NO. 16:** Capital Crossing objects to this
> request to the extent it is overbroad, unduly
> burdensome, seeks information already in MAPFRE's
> possession, including through discovery and/or
> documents filed in this case, and seeks information
> not reasonably calculated to lead to the discovery of
> admissible evidence.  Subject to and without waiving
> any general or specific objection, Capital Crossing
> responds that documents responsive to this Request
> will be produced on a rolling basis.

SUF ¶ 250.

On November 2, 2020, the Court in the Massachusetts Action
issued an order on MAPFRE's motion to compel discovery.  The
Court's Order provides, in relevant part:

> Interrogatory Number 7 seeks clear, specific
> information as to the properties over which the

parties dispute the claims made by Capital Crossing.
At present, while the parties are in Phase I, the
scope of the Interrogatory reaches only the twenty
identified properties.  Doc. No. 79 at 5.  Capital
Crossing has answered the last three subparts of the
Interrogatory as to these twenty properties.  As to
the first three subparts, it points to 678 records
amounting to 6000 pages of discovery and explains
that, under Rule 33(d), the burden of identifying the
requested information from the records is
substantially similar for both parties.  Doc. No. 83
at 4-5.  The Court rejects this contention based on
the response from MAPFRE that its counsel re-reviewed
the documents provided and concluded that the answers
to the specific questions posed in first three
subparts were not contained therein as to all twenty
properties.  Doc. No. 86 at 2-4.  Accordingly, the
Motion to Compel further answer to Interrogatory 7 is
ALLOWED.

SUF ¶ 251.

On or about December 17, 2020, following the Court's

November 2, 2020 order compelling Capital Crossing's responses

to certain of MAPFRE's interrogatories, Capital Crossing served

a supplemental interrogatory response to Interrogatory Nos. 7

and 15.  SUF ¶ 252.  In response to Interrogatory No. 7, subpart

(a), requesting the "date on which you acquired title to and/or

foreclosed on the property, indicating in your answer if the

property was acquired by repossession, foreclosure, deed in lieu

of foreclosure, or as mortgagee in possession," Capital Crossing

answered that each of the Phase I properties had been **"acquired

. . . in loan form" by one of the Purchasers** (referred to as

"Bautista, Triangle, and Abbey"), stated the date these loans

were acquired (all of which were between September 20, 2014 and

December 30, 2016), and **indicated that none of the Phase I
Properties had been acquired through repossession, foreclosure,
deed in lieu of foreclosure or as mortgagee in possession prior
to Hurricane Maria.** Id. (emphasis added).

These supplemental interrogatory responses also identified
the Real Legacy and Multinational Policies that relate to the
Phase I Kopel Properties by name and policy number and specified
the October 2017 date it asserted that the borrower provided it
with evidence of insurance. SUF ¶ 253. Capital Crossing's
interrogatory responses identify each of the Phase I properties,
including those acquired through foreclosure (after the loss),
by the account note, which Jeff Anderson testified was the "loan
number." SUF ¶ 254.

On February 24, 2021, Capital Crossing confirmed at its
deposition that **Capital Crossing does not own, and has never
owned, any of the Phase I properties for which Capital Crossing
submitted claims, and that at the time of Hurricane Maria, none
of the Phase I properties had been acquired through
repossession, foreclosure, deed in lieu of foreclosure, or as
mortgagee in possession by any of the lenders holding the loans
secured by the Phase I properties.** SUF ¶ 255 (emphasis added).

On March 10, 2021, MAPFRE filed a motion to amend its
Answer and Counterclaim in this matter to assert additional

claims and defenses, including a claim for fraud against Capital Crossing.  SUF ¶ 256.

On March 11, 2021, MAPFRE sent a letter to the Anti-fraud Special Investigations Unit of the Office of the Commissioner of Insurance of Puerto Rico, providing what MAPFRE asserted was "the available information obtained regarding acts that in our opinion may constitute fraud in the processing of the insurance claim by the Insured Capital Crossing Servicing Company, LLC with respect to the referenced claims" and asserting the following (in part):

> Convinced by false representations, omission of information and other acts of the Insured, MAPFRE has made payments in excess of USD 9,000,000.00, to which the Insured is not entitled under the Policy.  For detailed information regarding the Insured's conduct, please refer to the *Amended Answer and Amended Counterclaim* filed by MAPFRE in the civil case before the United States District Court for the District of Massachusetts as consolidated with the parallel action in the United States District Court for the District of Puerto Rico.  The application to file the Answer to Amended Complaint and Amended Counterclaim with the corresponding attachments are also included.

SUF ¶ 257.  To date, MAPFRE has paid to Capital Crossing $3,863,950.90 on Capital Crossing's claims for the Phase I Claims.  SUF ¶ 259.  To this date, Capital Crossing insists that MAPFRE pay the Net Claim Amount (with loss ceiling) set forth for the Phase I properties.  SUF ¶ 260.  The following chart is

based upon the statement of undisputed facts (ATP = Agreed to
Pay):

| Property No. | Description | ID No. | Kopel | Parties' Description | Claim Amt. | Amount Paid | MAPFRE ATP | Denied coverage? |
|---|---|---|---|---|---|---|---|---|
| 1 | F&A Investment | 25744 | | F&A | $1,489,574.41 | $ 711,973.35 | Y | N |
| 2 | PDCM LLC | 26987 | x | Plaza Aquarium | $4,500,844.58 | $      – | Y | Y |
| 3 | PDCM LLC | 26282 | x | Plaza Yabucoa | $2,248,958.47 | $      – | Y | Y |
| 4 | PDCM LLC | 27985 | x | Guayama Business Center | $1,340,000.00 | $      – | N | Y |
| 5 | Lago Esmeralda Developer | 27990 | | Lago | $1,852,893.72 | $   63,309.60 | Y | Y |
| 6 | Distribuidora Flamingo | 27664 | | Distribudora | $ 717,947.00 | $ 717,947.00 | Y | N |
| 7 | La Casa De Las Puertas | 25865 | | La Casa | $ 715,000.00 | $ 715,000.00 | Y | N |
| 8 | Ponce Real Estate Co. | 27509 | | Ponce 53 Vives | $ 279,000.00 | $      – | Y | Y |
| 9 | Ponce Real Estate Co. | 27510 | | Ponce 55 Vives | $ 246,000.00 | $      – | N | Y |
| 10 | PDCM LLC | 27979 | x | Valle Real | $ 976,801.63 | $      – | Y | Y |
| 11 | Haras Santa Isabel | 25316 | | Haras | $ 400,000.00 | $ 400,000.00 | Y | N |
| 12 | Portico Del Sol Inc. | 26519 | | Portico | $ 666,005.91 | $ 234,449.00 | Y | N |
| 13 | Malave Heli Rivera | 26782 | | Malave | $ 670,696.35 | $ 376,767.80 | Y | Y |
| 14 | Terra II MC&P Inc. | 27860 | | Terra II | $ 568,049.59 | $   39,918.74 | Y | Y |
| 15 | Ormo Development Corp. | 27222 | | Ormo | $ 570,377.58 | $   97,895.58 | Y | N |
| 16 | Terrazas de Borinquen | 27963 | | Terrazas | $ 488,956.29 | $   88,428.75 | Y | N |
| 17 | Kerry Nava Inc. | 27185 | | Kerry Nava | $ 433,077.08 | $   96,863.63 | Y | Y |
| 18 | National Lumber | 27976 | x | National Lumber | $ 381,672.14 | $ 242,152.99 | Y | N |
| 19 | MOLLHA SE | 27732 | | Mollha | $ 188,741.72 | $      – | N | Y |
| 20 | Edna Torres Centeno | 27284 | | Edna | $ 118,564.65 | $ 113,181.97 | Y | N |

See SUF ¶¶ 261–568.  From the chart it appears that as to
Properties 6, 11,12, 15, 16, 18 and 20, MAPFRE both agreed to
pay and did not deny coverage.  As to the remaining Phase I
properties, there are variations of some claims that were paid
but coverage later denied, and others where no agreement to pay
and coverage was denied.

## IV.  RULINGS OF LAW

As state above, the parties here are proceeding case
stated[10] with respect to the following four questions:

-------------------------

[10] "Case stated hearings provide an efficacious procedural
alternative to cross motions for summary judgment."  Moitoso v.
FMR LLC, 451 F. Supp. 3d 189, 198 (D. Mass. 2020).  "In a case
stated, the parties waive trial and present the case to the
court on the undisputed facts in the pre-trial record."
Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 10-11
(1st Cir. 2012) (internal quotation marks omitted).  Although
the case stated procedural device entitles the court to "engage

Question No. 1 - What coverage does the Policy afford, and
in particular, does the Policy cover any of
the Phase I Properties?

Question No. 2 - Do Endorsements 1-16 modify the Policy to
cover the Phase I Properties?

Question No. 3 - Does Capital Crossing have an insurable
interest in the Phase I Properties?

Question No. 4 - Does the existence of other property
insurance bar coverage for the Kopel
Properties?

**A. The Policy Does Not Cover the Phase I Properties**

The Policy does not cover the Phase I Properties. Capital
Crossing bears the burden of establishing coverage, and here
Capital Crossing has not met its burden. Inasmuch as there is
no coverage, the Court need not determine the scope of coverage
afforded under the Policy.

---

in a certain amount of factfinding," id., "case stated hearings
usually involve but a modicum [thereof] -- nothing more than the
drawing of reasonable inferences," Moitoso, 451 F. Supp. at 199.
Unlike at summary judgment, "the Court is relieved of drawing
all inferences against each moving party, instead drawing such
inferences as are reasonable to resolve the case." Chiocca v.
Town of Rockland, No. CV 19-10482-WGY, 2022 WL 4817094, at *16
(D. Mass. Oct. 3, 2022) (quoting Bunch v. W.R. Grace & Co., 532
F. Supp. 2d 283, 287 (D. Mass. 2008)). See Massachusetts
Lobstermen's Assn., Inc. v. National Marine Fisheries Serv., No.
CV 24-10332-WGY, 2024 WL 2194260, at *3 n.5 (D. Mass. Apr. 16,
2024).

### 1. Insurance Policy Rules of Interpretation under Puerto Rico Law

In this diversity action, the parties do not dispute that the substantive law of Puerto Rico applies, and that therefore this Court "must first turn to the Insurance Code of Puerto Rico as . . . [its] guide on the path to interpreting the underlying insurance contract." Lopez & Medina Corp. v. Marsh USA, Inc., 667 F.3d 58, 64 (1st Cir. 2012).

Under Puerto Rico law, "[e]very insurance contract" is "construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any lawful rider, endorsement, or application attached to and made a part of the policy." P.R. Laws Ann. tit. 26, § 1125; see Lopez & Medina Corp., 667 F.3d at 64; Quinones Lopez v. Manzano Pozas, 141 D.P.R. 139 (P.R. 1996) (same).[11]

As here, "[w]here the Insurance Code fails to provide an interpretative approach for a given situation, [this Court] also

---

[11] As for an insurance application, "[a]ny application for insurance shall be made a part of the policy. No insurance policy application shall be admissible as evidence in any suit or procedure related to said policy, unless a true and exact copy of the application is attached to the policy or otherwise made a part thereof at the time it is issued and delivered; if a true and exact copy of the application is furnished to the insured party after thirty (30) days of the policy being delivered, provided it is any type of insurance other than life insurance." P.R. Laws Ann. tit. 26, § 1109.

may turn to the Civil Code as a supplemental source of law."

Id. Specifically,

> "Article 1233 of the Puerto Rico Civil Code provides
> that when the terms of a **contract are clear and leave no
> doubt as to the intentions of the contracting parties,
> the literal sense of its stipulations shall be
> observed.**" [Nieves v. Intercontinental Life Ins. Co. of
> Puerto Rico, 964 F.2d 60, 63 (1st Cir. 1992), as amended
> (May 18, 1992)]. (quoting P.R. Laws Ann. tit. 31, § 3471)
> (internal quotation marks omitted).   "[A] term is
> considered 'clear' when it is sufficiently lucid to be
> understood to have one particular meaning, without room
> for doubt." [Jimenez v. Triple S. Inc., 154 F. Supp. 2d
> 236, 238 (D.P.R. 2001)] (quoting Hopgood v. Merrill
> Lynch, Pierce, Fenner & Smith, 839 F.Supp. 98, 104
> (D.P.R.1993)) (internal quotation marks omitted).   On
> the other hand, where a policy's language is unclear, we
> must construe the provisions against the insurer. Great
> Am. Ins. Co. v. Riso, Inc., 479 F.3d 158, 162 (1st
> Cir.2007). **We deem ambiguity present in a policy if a
> word or phrase is reasonably susceptible to more than
> one construction.** Id. at 163 (stating that "[t]he
> ambiguities canon applies only where the policy can
> reasonably be read two ways, and the touchstone of
> coverage is expectation of protective insurance
> reasonably generated by the terms of the policy"
> (internal quotation marks and citation omitted)).

Id. (emphasis added).  Simply put, the Court is "barred from

considering extrinsic evidence in a written contract where the

terms are clear and unambiguous." Triangle Cayman Asset Co. v.

LG and AC, Corp., 52 F.4th 24, 32 (1st Cir. 2022) (citing

Borschow Hosp. and Med. Supplies, Inc. v. Cesar Castillo Inc.,

96 F.3d 10, 15-16 (1st Cir. 1996) ("[W]e mean what we say, and

say what we mean: extrinsic evidence of the parties' intent is

inadmissible in the face of a clear and unambiguous contract term under Puerto Rico Law.").

"If the contract is ambiguous 'the intention of the parties' controls' which 'can be demonstrated by their conduct, both prior and subsequent to the contract.'" Coco Rico, LLC v. Universal Ins. Co., No. CV 21-1390 (MEL), 2023 WL 3737063, at *3 (D.P.R. May 30, 2023) (López, M.J.) (quoting Puerto Rico Elec. Power Auth. v. Philipps, 645 F. Supp. 770, 773 (D.P.R. 1986) (Fuste, J.)). Where ambiguity is present, "extrinsic evidence may be considered to determine the intention of the parties." Id. (quoting Autoridad de Carreteras y Transportacion v. TransCore Atl., Inc., 387 F. Supp. 3d 163, 169 (D.P.R. 2017) (Besosa, J.)). "[A]bsent an ambiguity," however, the Court "must interpret the insurance contract according to its 'plain meaning, as a whole, and in harmony with the general purposes of the policy.'" Id. (quoting Zurich Am. Ins. v. Lord Elec. Co. of Puerto Rico, 986 F. Supp. 2d 104, 110 (D.P.R. 2013) (Casellas, J.)). Even in the above context, under Puerto Rico law, insurance contracts are contracts of adhesion that require "liberal construction in favor of the insured." Id. (citations and quotations omitted). As the Supreme Court of Puerto Rico has explained,

> nice constructions that would allow insurers to dodge
> liability are not favored. It is incumbent upon the
> courts to find the sense and meaning that a person of

average intelligence would give to the language of a
policy. . . Emphasis should not be laid on grammatical
rigour, but rather on the general, popular use of words,
so insurance contracts may be understood and construed
according to the most common and usual meaning.

Quinones Lopez, 141 D.P.R. at 155.

Capital Crossing bears the burden of establishing coverage.

TSL Transport Sols., Inc. v. Cruz, 518 F. Supp. 3d 558, 562

(D.P.R. 2021) (citing Nahan v. Pan Am. Grain Mfg. Co., Inc., 62

F. Supp. 2d 419, 424 (D.P.R. 1999) (Dominguez, J.)).  With the

above standards in mind, the Court sitting in diversity, and

applying Puerto Rico law, interprets the Policy.

### 2. The Policy Is Not Ambiguous

The Court rules that the Policy is not ambiguous as matter

of law.  Accordingly, the Court may not -- and does not --

consider the intentions of the parties or the voluminous

extrinsic evidence.  Here, the Policy provides coverage only for

"**foreclosed** properties," or those "**[a]cquired by [Capital**

**Crossing]** during the policy period through **repossession,**

**foreclosure, deed in lieu of foreclosure or as a mortgagee in**

**possession,** and [] not yet described in the Schedule (Report) of

**foreclosed** property [or] not reported to [MAPFRE]."  SUF ¶ 121

(emphasis added).

The term "foreclosed" is not defined in the Policy.  As

MAPFRE correctly argues, however, under any definition the term

"foreclosed" describes acquisition of property through legal

process.  MAPFRE Case Stated Mem. 7.  Read in conjunction with

the after-acquired property provision, it is clear from the face

of the Policy that coverage is limited to foreclosed properties

and those after-acquired "through repossession, foreclosure,

deed in lieu of foreclosure or as mortgagee in possession."  SUF

¶ 121.  Taken as a whole, there is no reasonable interpretation

wherein the Policy could cover any property that was not

"acquired," let alone foreclosed upon, regardless of its

unilateral inclusion on a premium determination Endorsement.

Absent an ambiguity in the Policy -- and there is none -- there

is no basis to resort to extrinsic evidence.[12]  The Policy does

not cover the Phase I Properties because **none** were acquired

foreclosed properties or acquired through "repossession,

foreclosure, deed in lieu of foreclosure or as a mortgagee in

possession."  Policy, Endorsement A 61, ECF No. 66-1.  The Court

therefore need not proceed further and determine the

hypothetical question of scope of coverage if the Phase I

Properties did not fall within that classification.

---

[12] Captal Crossing's reliance on Banco de la Vivienda v.
Pagán Insurance Underwriters, 1981 JTS [Supreme Court Judgment]
40 (May 6, 1981) is misplaced.  There, the "conditions and terms
of the invitation to auction accepted by the insurer [could] not
be breached in the text of the policy, which in this case is no
more than the external form of what was agreed between the
parties when the insurer bids and the auction is awarded by the
Secretary of Finance."  Id.

In the end, what occurred here -- at least on the undisputed facts -- is that Capital Crossing's insurance agent identified the very coverage gap that was revealed by the claims here.  Nevertheless, during the run-up to the Policy, it attempted to modify foreclosed properties by including loans in the specifications.  Capital Crossing then -- for whatever reason -- changed insurance brokers, and that new broker did not follow up.  This history is not considered by the Court, however, because the Policy simply does not provide coverage for the Phase I Properties.  Capital Crossing cannot bootstrap coverage by placing properties onto a list that do not comply with the Policy's coverage provisions.  It did not have forced place coverage; it had a foreclosed property policy that affords no coverage on its face to the Phase I Properties.[13]

### B.    Endorsements 1 – 16 Do Not Modify the Policy to Afford Coverage of the Phase I Properties Under the Policy

The Policy Endorsements do not change the substantive terms of the Policies.  Indeed, as MAPFRE again correctly argues, MAPFRE Case Stated Mem. 21-22, each endorsement changes the Policy by merely reassessing the premium amount.  See generally Endorsements 1 – 16.  Even if certain properties were "endorsed"

---

[13] The Court observes that to the extent that the Phase I Properties were not covered under the Policy, a question arises as to whether the premiums paid in apparent error ought be returned to Capital Crossing.

onto the Policy, that was for purposes of premium determination, not a coverage determination.  The Endorsements, therefore, do not modify the Policy to add coverage of the Phase I properties.

### C. Capital Crossing Does Have An Insurable Interest in the Phase I Properties

Capital Crossing attempts to collapse the insurable interest argument into an analysis under <u>Carpets & Rugs Warehouses</u> v. <u>Tropical Reps & Distributors</u>, 175 D.P.R. 615 (2009).  This argument is misplaced.

Under Puerto Rico law, Capital Crossing bears the burden of establishing an insurable interest in the Phase I Properties. <u>El Fenix de Puerto Rico</u> v. <u>Serrano Gutierrez</u>, 786 F. Supp. 1065, 1069 (D.P.R. 1991) (Pieras, J.).  The Puerto Rico Insurance Code provides as follows:

§ 1105 Insurable interest-Property and interests

(1) **No insurance contract on property or of any interest therein or arising therefrom shall be legally enforceable as to the insurance except for the benefit of persons having an insurable interest in the things insured.**

(2) Insurable interest.- As used in this section means **any actual lawful, and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage or impairmen**t.

(3) The measure of an insurable interest in property **is the extent to which the insured might be damnified by loss, injury, or impairment thereof.**

P.R. Laws Ann. tit. 26, § 1105 (emphasis added).  "Requiring an insurable interest as a prerequisite to recovery prevents gambling through insurance polices [sic], prevents rewarding and thereby tempting the destruction of property, and confines insurance contracts to indemnity."  New Ponce Shopping Ctr., S.E. v. Integrand Assur. Co., 86 F.3d 265, 268 (1st Cir. 1996). Capital Crossing claims that it has an insurable interest by virtue of its contracts with its clients.  MAPFRE argues that Capital Crossing had the right, but not the obligation, to obtain insurance on the Phase I Properties.

A review of the Servicing Agreement proves otherwise, inasmuch as Capital Crossing was required as part of its services to "tak[e] actions to maintain appropriate insurance coverages when necessary."  Services Agreement, § 2.02, ECF No. 70-2.

The Service Agreement also provides:

The Primary Servicer **shall also maintain the ability** to force place hazard insurance coverage ("Blanket Policy"), permitting each Servicer to insure Loan Assets for any individual Loan **in the event that an Obligor allows its hazard Insurance Policy to lapse.  Each Servicer shall obtain the Company's written approval prior to force placing hazard insurance coverage in regard to a particular Loan Asset.  The Company shall respond to such request within five (5) Business Days. Failure by the Company to respond to such request shall be deemed to be approval by the Company.**  Each Servicer shall bill the applicable Obligor for any premium incurred under the Blanket Policy in regard to the Loan, but shall be entitled to reimbursement from the Company for any premium incurred for such coverage as an Out-

> of-Pocket Expense.  In the event that the premium
> incurred under the Blanket Policy is paid by the
> applicable Obligor, the applicable Servicer shall
> deposit the amount in the Collection Account.  In
> connection with its activities as administrator and
> servicer of the Loans, each Servicer agrees to prepare
> and present, on behalf of itself and Company, claims
> under any such Blanket Policy in a timely fashion in
> accordance with the terms of such policy.

Services Agreement, Section 2.08(c) (emphasis added).

Furthermore, MAPFRE argues that, even were there an insurable interest, Capital Crossing's subsidiary actually was the contracting party with the clients, not Capital Crossing, under a Supplemental Agreement.  See MAPFRE Case Stated Mem. 25-26.

An insurable interest is a broad concept that includes "any actual lawful, and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage or impairment."  P.R. Laws Ann. tit. 26, § 1105(2).  The parties do not cite to any case law that sheds light onto the Puerto Rico Insurance Code.  The Court rules that Capital Crossing had an insurable interest, but did not obtain appropriate insurance.

### D.  Kopel Properties

MAPFRE argues that the so-called Kopel Properties are not covered under the Policy because there existed other insurance covering these Phase I properties.  MAPFRE Case Stated Mem. 26.

The Kopel Properties are a subset of the Phase I Properties as follows:

| Property No. | Description | ID No. | Kopel | Parties' Description | Claim Amt. | Amount Paid | MAPFRE ATP | Denied coverag? |
|---|---|---|---|---|---|---|---|---|
| 2 | PDCM LLC | 26987 | x | Plaza Aquarium | $4,500,844.58 | $    - | Y | Y |
| 3 | PDCM LLC | 26282 | x | Plaza Yabucoa | $2,248,958.47 | $    - | Y | Y |
| 4 | PDCM LLC | 27985 | x | Guayama Business Center | $1,340,000.00 | $    - | N | Y |
| 10 | PDCM LLC | 27979 | x | Valle Real | $  976,801.63 | $    - | Y | Y |
| 18 | National Lumber | 27976 | x | National Lumber | $  381,672.14 | $ 242,152.99 | Y | N |

Section 1.1.c of Endorsement A of the Policy provides in pertinent part that insurance ends on the "date other specific insurance applies to the property." Policy, Endorsement A 61. The parties do not dispute that two other policies, the Real Legacy Policy (covering Property Nos. 2, 3, and 10, above) and Multinational Policy (covering Property Nos. 4 and 18, above), were in effect, but dispute whether the Policy exclusion applies. On the case-stated record, the Court rules that this other insurance does not trigger the exclusion because there is no evidence that Capital Crossing was a named insured, additional insured, or loss payee under either of these policies. Indeed, there is no evidence that Capital Crossing was in a position to make a claim under either policy at all.

**V.    REMAINING ISSUES – APPLICATION OF PUERTO RICO INSURANCE CODE ADJUSTMENT PROVISIONS AND THE PUERTO RICO SUPREME COURT'S CARPETS & RUGS DECISION**

The Court was requested to determine specific coverage issues on a case-stated basis. Though the Court has determined that there is no coverage afforded under the Policy as to the Phase I Properties, that does not ultimately end the issue because there were apparent adjustments made on seventeen of the

Phase I properties that, absent fraud or extraordinary

circumstances -- an open issue not determined here -- **are**

potentially binding upon MAPFRE under Puerto Rico law.

> Under Puerto Rico law, an insurance company is
> required to conduct a diligent investigation before
> making an offer of payment or adjustment, which must
> "include[e] 1) determining whether the damage event
> occurred during the validity of the policy; 2)
> determining whether the insured claimant had an
> insurable interest; 3) determining whether the damaged
> property is the property described in the
> declarations; 4) confirming whether the losses claimed
> are not subject to risk exclusions; and 5)
> investigating whether the damage was caused by third-
> party negligence, so that the insurer may be
> subrogated in the right to compensation of the
> insured." . . . . **Moreover, "an insurer is not
> permitted to retract the adjustment that it is under
> obligation to submit to the insured, except in cases
> of fraud on the part of the claimant or other
> extraordinary circumstances which the insurer had been
> unable to discover in spite of a diligent
> investigation."**

QBE Seguros v. Morales-Vazquez, No. CV 15-2091 (BJM), 2018 WL

2979504, at *2 (D.P.R. June 12, 2018) (McGiverin, M.J.) (quoting

Carpets & Rugs Warehouses v. Tropical Reps & Distributors, 175

D.P.R. 615 (2009)).

> As the Puerto Rico Supreme Court further explained,

> This section also **establishes the terms that the
> insurers will have to resolve claims.** Thus, Art.
> 27,162, . . . establishes as relevant:

>> . . . The **investigation, adjustment and
>> resolution of any claim shall be made within
>> the reasonably shortest period of time
>> within the first forty-five (45) days after
>> submission to the insurer of all documents**

**necessary to dispose of such claim.** Only in **extraordinary cases may that first period be extended, but such extension may never exceed the term of ninety (90) days from the date on which the claim was filed.** In those cases where the insurer needs an additional term to the ninety (90) days, **it must request it in writing from the Commissioner twenty (20) days before the expiration of said ninety (90) days, and the claimant must also be notified.** If the Commissioner believes that the request for additional time is unreasonable, because it is not duly justified or the additional time is excessive, he shall notify the insurer that such extension is not admissible and that, therefore, it must dispose of the claim within the regulatory term or within the additional term granted in such notification.

The article **establishes an obligation for insurers to investigate, adjust and resolve any claim submitted to them in the shortest possible time, within the first forty-five days after all documents necessary to resolve the claim have been submitted to the insurer. The Legislative Assembly provided that the claim must be resolved within a maximum of ninety days after it is filed.**

Id. at 632-33.  The Puerto Rico Supreme Court has also stated:

The investigation, adjustment and resolution of claims by the insurer **is not a futile exercise or pro forma** that the insurers must comply with in order not to be fined by the Insurance Commissioner, **but rather is the work document through which the insurer formally responds to its insured whether or not its claim is admissible, and if so, what such adjustment amounts to.  Said communication, as clearly established in the Puerto Rico Insurance Code and interpreted previously by this Court, must be issued within a maximum period of ninety days from the time the claim is filed.**
. . . .

Id. at 636 (emphasis added).

[87]

> As we stated above, **an insurer is not permitted to retract from the adjustment made in the resolution of an insured's claim, except for fraud by the claimant or other extraordinary circumstances that the insurer was unable to discover despite diligent investigation.**

Id. at 641 (emphasis added).

MAPFRE argues that Carpets & Rugs is merely dicta on the issue and, in any event, does not overrule the general proposition that waiver and estoppel cannot extend coverage. MAPFRE Opp'n Capital Crossing Case Stated 15 n.10.  Under the Puerto Rico Insurance Code, however, insurers appear to have a **statutory** obligation requiring that once, as here, an insurer determines there is coverage after diligent investigation, that insurer is stuck with that determination absent fraud or extraordinary circumstances.  While there appears to be intermediate appellate case law in Puerto Rico interpreting Carpets & Rugs -- even some decisions involving MAPFRE[14] -- the

---

[14] See e.g., Feliciano Aguayo v. Mapfre Panamerican Ins. Co., 207 D.P.R. 138 (P.R. May 28, 2021) (Spanish Language); Consejo de Titulares del Condominio La Ciudadela v. MAPFRE PRAICO Ins. Co., No. BY2019CV005571, 2023 WL 2958703, at *6 (P.R. Cir. Mar. 28, 2023) (Spanish Language); Smart Connection, LLC v. MAPFRE PRAICO Ins. Co., No. CA2019CV03718, 2022 WL 3355093, at *2 (P.R. Cir. July 11, 2022) (Spanish Language). The Court does not consider these cases because they are not in the English language.  See Puerto Rico Electric Power Auth. v. Vitol, Inc., No. CV 09-2242 (DRD), 2012 WL 12995662, at *6 (D.P.R. Aug. 2, 2012).  To the extent that this case law may address the issues pertinent to Carpets & Rugs, it behooves the parties to present translated cases to the Court at trial so that it may benefit from the Puerto Rico courts' analysis of the law of the application of the law of the Commonwealth.

parties have not filed English language translations of the Puerto Rico cases.

As best this Court can discern, the Puerto Rico Legislature has decided -- and the Puerto Rico Supreme Court appears to concur -- that the onus of errors in assessing coverage in an insurance claim determination fall on the insurer, not the insured.  Principles of equity are built into the statute, relieving an erroneous determination only for fraud or extraordinary circumstances.

This analysis puts the action in an interesting posture. As matter of law, the Court's analysis purely of the Policy comports with MAPFRE's counsel's belated, though correct, interpretation of the coverage of the Policy.  At the same time, MAPFRE in most cases appears to have adjusted, and in some cases, paid claims on some of the Phase I Properties.  The Properties at issue include:

| Property No. | Description | ID No. | Kopel | Parties' Description | Claim Amt. | Amount Paid | MAPFRE AT[7] | Denied coverag? |
|---|---|---|---|---|---|---|---|---|
| 1 | F&A Investment | 25744 | | F&A | $1,489,574.41 | $ 711,973.35 | Y | N |
| 2 | PDCM LLC | 26987 | x | Plaza Aquarium | $4,500,844.58 | $ — | Y | Y |
| 3 | PDCM LLC | 26282 | x | Plaza Yabucoa | $2,248,958.47 | $ — | Y | Y |
| 5 | Lago Esmeralda Developer | 27990 | | Lago | $1,852,893.72 | $ 63,309.60 | Y | Y |
| 6 | Distribuidora Flamingo | 27664 | | Distribudora | $ 717,947.00 | $ 717,947.00 | Y | N |
| 7 | La Casa De Las Puertas | 25865 | | La Casa | $ 715,000.00 | $ 715,000.00 | Y | N |
| 10 | PDCM LLC | 27979 | x | Valle Real | $ 976,801.63 | $ — | Y | Y |
| 11 | Haras Santa Isabel | 25316 | | Haras | $ 400,000.00 | $ 400,000.00 | Y | N |
| 12 | Portico Del Sol Inc. | 26519 | | Portico | $ 666,005.91 | $ 234,449.00 | Y | N |
| 13 | Malave Heli Rivera | 25782 | | Malave | $ 670,695.35 | $ 376,757.80 | Y | Y |
| 14 | Terra II MC&P Inc. | 27850 | | Terra II | $ 568,049.59 | $ 39,918.74 | Y | Y |
| 15 | Ormo Development Corp. | 27222 | | Ormo | $ 570,377.58 | $ 97,895.58 | Y | N |
| 16 | Terrazas de Borinquen | 27963 | | Terrazas | $ 488,956.29 | $ 88,428.75 | Y | N |
| 17 | Kerry Nava Inc. | 27185 | | Kerry Nava | $ 433,077.08 | $ 96,853.63 | Y | N |
| 18 | National Lumber | 27976 | x | National Lumber | $ 381,672.14 | $ 242,152.99 | Y | N |
| 20 | Edna Torres Centeno | 27284 | | Edna | $ 118,564.65 | $ 113,181.97 | Y | N |

It is beyond the case-stated record to determine the issue as to how the statutory condition affects the rights and

obligations of the parties, because there remain questions of fact as to both whether and to what extent claims were adjusted or resolved and whether fraud or extraordinary circumstances permit retraction of any particular claim.  There are also questions as to the extent that MAPFRE is bound beyond what it agreed to pay, if anything, where coverage was established through MAPFRE's purported error.  Rather, these questions are more appropriately determined at trial.  See QBE Seguros, 2018 WL 2979504, at *3 (denying summary judgment as to issue of fraud and diligence where questions of fact persisted).  As far as the Court can discern from the record before it, these issues are matters of first impression.

## VI.   CROSS-MOTIONS FOR SUMMARY JUDGMENT

The parties each submitted partial motions for summary judgment.  For the reasons set forth below, Capital Crossing's motion for partial summary judgment is DENIED and MAPFRE's motion for partial summary judgment is ALLOWED in part and DENIED in part .

### A.   Legal Standard on Motions For Summary Judgment

"Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Gattineri v. Wynn MA, LLC, 93 F.4th 505, 509 (1st Cir. 2024) (citations and quotations omitted).  "The summary judgment ritual is standard fare: once

the movant 'adumbrate[s] 'an absence of evidence to support the
nonmoving party's case,' . . . the burden shifts to the
nonmovant to establish the existence of a genuine issue of
material fact." Boykin v. Genzyme Therapeutic Products, LP, 93
F.4th 56, 60 (1st Cir. 2024) (quoting Brennan v. Hendrigan, 888
F.2d 189, 191 (1st Cir. 1989) (quoting Celotex Corp. v. Catrett,
477 U.S. 317, 325 (1986))).  "To carry this burden, the
nonmovant cannot simply rely on evidence that is 'conjectural or
problematic,' . . . but, rather, 'must present definite,
competent evidence.'" Id. (citation omitted).

     The above standard applies where the non-moving party bears
the burden.  As this Court has written, the standard is higher
for a moving party that also bears the burden of proof at trial:

> When the moving party also bears the burden at trial,
> as is the case here, its burden of proof includes
> "producing incontrovertible prima facie evidence of
> its claims." Atlantic Specialty Insurance Co. v.
> Karl's Boat Shop, Inc., 480 F.Supp.3d 322 (D. Mass.
> 2020) (citing Celotex Corp., 477 U.S. 317 at 331).  If
> the movant does so, then the nonmovant must set forth
> specific facts sufficient to establish a genuine issue
> for trial.  Matsushita Elec. Indus. Co. v. Zenith
> Radio Corp., 475 U.S. 574, 586–87 (1986).

Sec. & Exch. Comm'n v. Sharp, No. CV 21-11276-WGY, 2023 WL
6127283, at *1 (D. Mass. Sept. 19, 2023).  In all cases, the
Court draws all reasonable inferences in favor of the non-moving
party.  See Lech v. von Goeler, 92 F.4th 56, 64 (1st Cir. 2024);

Hamdallah v. CPC Carolina PR, LLC, 91 F.4th 1, 16 (1st Cir. 2024).

### B.   Capital Crossing's Motion for Summary Judgment

Capital Crossing's motion for partial summary judgment, ECF No. 99, is denied.  Relying on the undisputed facts in the case stated on the record, Capital Crossing moves for partial summary judgment on MAPFRE's counterclaims and defenses.  MAPFRE counters claiming there are disputed facts as to motive and intent that preclude summary judgment.  See MAPFRE Summ. J. Opp'n 1.  Reviewing the record as a whole, when viewing the constellation of hotly contested facts in this case, taken in the light most flattering to MAPFRE, Capital Crossing's motion for summary judgment is denied.

First, there is conflicting evidence as to whether Capital Crossing misrepresented loan collateral.  Issues concerning fraud and misrepresentation are rarely appropriate for summary judgment.  So it is here.  As to the fraud, concealment and misrepresentation issues, the record is murky.  On the one hand, there are references to force-placed coverage, there are annotations on the reports that appear to indicate loans and REO properties.  There are requests for insurance that includes loans, and ambivalent responses.  There is also evidence of doubt and concern within Capital Crossing as to what was covered.  There is evidence that MAPFRE was not treating the

policies as including forced place coverage, but rather
foreclosed property coverage. There is evidence that Capital
Crossing was not candid in disclosing information to MAPFRE.
Indeed, there is evidence that Capital Crossing withheld basic
information even through discovery in the Massachusetts Action.
This does not mean that MAPFRE will ultimately prevail on its
counterclaims, but under the summary judgment standard -- as
opposed to case stated standard -- Capital Crossing is not
entitled to summary judgment because that would entail weighing
the evidence. Taking all reasonable inferences in favor of
MAPFRE, as this Court must, summary judgment is inappropriate.

The coverage defense issues are moot because the Court has
determined on the case-stated record that there is no coverage
for the Phase I Properties under the Policy, save for the open
issues related to Carpet & Rugs, supra.

**C.   MAPFRE's Motion For Summary Judgment**

MAPFRE's motion for summary judgment, ECF No. 88, is
allowed in part and denied in part. MAPFRE moves for summary
judgment on two fronts. First, it claims that as matter of law,
under the Policy, Capital Crossing was not entitled to add
properties after the loss occurrence. See MAPFRE Mot. Summ. J.
1. Second, MAPFRE asserts that Capital Crossing does not meet
the jurisdictional requirements to bring an unfair and deceptive

business practice claim under Massachusetts and Puerto Rico law. Id. 2-3.

As for the first issue, the Court has already determined that there is no coverage for the Phase I Properties, and therefore, as argued by MAPFRE, the Court need not reach this issue.  MAPFRE Summ. J. Mem. 7 n.5.  As for some of the properties where an adjustment has been made, there remain questions of fact as to whether MAPFRE is nonetheless bound by its coverage determination.

As for the second issue, MAPRE is not entitled to summary judgment under Massachusetts law, but is entitled to summary judgment under Puerto Rico Law.  Pursuant to the unfair and deceptive business practices statute in Massachusetts, Mass. Gen. Laws ch. 93A, § 11:

> No action shall be brought or maintained under this section unless the **actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth.** For the purposes of this paragraph, **the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.**

Mass. Gen. Laws Ann. ch. 93A, § 11 (emphasis added).

"Under c. 93A, § 11, it is [the defendants'] burden to demonstrate that 'the center of gravity of the circumstances that [gave] rise to the claim' were not 'primarily and substantially within the Commonwealth.'"  Resolute Mgt. Inc. v.

Transatlantic Reinsurance Co., 87 Mass. App. Ct. 296, 300 (2015)
(quoting Skyhook Wireless, Inc. v. Google Inc., 86 Mass. App.
Ct. 611, 622 (2014); Kuwaiti Danish Computer Co. v. Digital
Equip. Corp., 438 Mass. 459, 470, 473 (2003)).  While it is true
that summary judgment can be granted on this affirmative defense
in certain circumstances, see Skyhook Wireless, Inc., 86 Mass.
App. Ct. at 622, "as the Supreme Judicial Court observed in
Kuwaiti Danish, . . . § 11 appears to contemplate that such an
assessment would occur following, and based upon, findings of
fact made by a judge." Resolute Mgt. Inc., 87 Mass. App. Ct. at
300.  Here, the Court must take all facts in favor of the non-
moving party and MAPFRE bears the burden of proof on this issue.
With this high standard in mind, on the summary judgment record
a reasonable jury could find that some of the communications and
effects of the acts or omissions were received in Massachusetts,
and therefore that the center of gravity of the alleged unfair
and deceptive practices occurred in Massachusetts.  A center-of-
gravity test is by its very nature a fact-specific analysis, and
here MAPFRE has not met its high burden.  Accordingly, summary
judgment is **DENIED** as to this issue, and MAPFRE's affirmative
defense as to Count III with respect to Chapter 93A is reserved
for trial.

As for the Puerto Rico unfair and deceptive claims
practices, Capital Crossing is outside of the notice provisions

of the Puerto Rico statute, and therefore it must be dismissed without prejudice for lack of subject matter jurisdiction. Pursuant to P.R. Laws Ann. tit. 26, § 2716d, as a condition precedent to suit, an insured must notify the Insurance Commissioner and its insurance company of the insurance company's bad faith conduct at least 60 days prior to filing a suit.[15]  Under Homeowners Association of 76 Kings Court Condominium v. MAPFRE PRAICO Ins. Co., Case No. AC-2020-103, 2022 WL 1076204 (P.R. Mar. 24, 2022), English Translation ECF No. 75-2, the Puerto Rico Supreme Court recently ruled that 60-day notice is jurisdictional, but that a dismissal where the precondition is not met is without prejudice.

There is no real dispute that the notice is untimely; indeed, Capital Crossing has moved to supplement its complaint in an attempt to cure.  See Mot. Leave File Suppl. Compl., ECF No. 74.  Here, Capital Crossing did not comply with the 60-day notice provision, but rather filed it contemporaneously with this suit.

---

[15] Section 2716d(3) provides in pertinent part:

As **a condition precedent to bringing an action** under this section, the affected party shall give written notice of such violation to the Commissioner and the insurer.  The Insurer shall have sixty (60) days to correct it.

P.R. Laws Ann. tit. 26, § 2716d(3) (emphasis added).

The motion to file a supplemental pleading, ECF No. 74, is DENIED, and summary judgment is ALLOWED in part, only to the extent this claim will be dismissed for lack of subject matter jurisdiction under Puerto Rico law.  To permit a supplemental pleading to cure this type of jurisdictional defect defeats the core purpose of the statute to promote pre-litigation resolution of disputes.  Rather, allowing supplementation would encourage parties to do exactly what Capital Crossing did here: file the statutory notice with a lawsuit.  The Supreme Court of Puerto Rico in Homeowners Association of 76 Kings Court Condominium affirmed the dismissal of that portion of the action, ECF No. 75-2 24-25; it did not contemplate supplemental pleading as proposed by Capital Crossing.  The Court follows the Puerto Rico Supreme Court's lead on this statutorily-imposed jurisdictional question under Puerto Rico law, and dismisses the Puerto Rico unfair and deceptive claim (Count III) for lack of subject matter jurisdiction.

## VII. CONCLUSION

For the aforementioned reasons, on case stated, the Court rules that while there is no coverage of the Phase I Properties under the unambiguous terms of the Policy, there remain questions of fact as to whether, under Puerto Rico law, MAPFRE is nonetheless bound by its determination of coverage of some of the Phase I Properties.

Capital Crossing's motion for partial summary judgment, ECF No. 99, is **DENIED**, and MAPFRE's motion for partial summary judgment, ECF NO. 88, is **ALLOWED in part and DENIED in part**, as set forth above.  Capital Crossing's motion to file a supplemental complaint, ECF No. 74, is **DENIED**.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[16]

---

[16] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 46 years.